Filed 2/27/13  P. v. Kovacevich CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>DANA KOVACEVICH,<br><br>　　　Defendant and Appellant. | H037257<br>(Santa Clara County<br>Super. Ct. No. CC756864) |

An information filed on May 16, 2008, charged Dana Kovacevich (appellant) with one count of assault on a child with force likely to produce great bodily injury resulting in death (Pen. Code, § 273ab, count one, hereafter child abuse homicide)[1] and one count of murder (§ 187, count two).[2]

Following a jury trial, appellant was found guilty as charged.  Subsequently, the court sentenced him to 25 years to life in prison on count one and 15 years to life on count two.  The court stayed the sentence on count two pursuant to section 654.  Appellant filed a timely notice of appeal.

On appeal, appellant raises numerous issues related to the trial court proceedings, which we will outline later.  In addition, he asks that we independently review the

---

[1]　Penal Code "[s]ection 273ab defines the offense of child abuse homicide." (*People v. Wyatt* (2010) 48 Cal.4th 776, 780 (*Wyatt*).)

[2]　All unspecified statutory references are to the Penal Code.

material considered by the trial court at an in camera *Pitchess* hearing.[3] For reasons that follow, we affirm the judgment.

*Evidence Adduced at Trial*

Joby Bayas met appellant in 2000 or 2001. Ms. Bayas and appellant began a long term relationship resulting in the birth of their son Justin on December 21, 2006. Due to the fact that Justin was in a breech position and the doctors could not turn him, he was delivered by Cesarean section. There were no complications with the delivery, but, initially, Justin was not breathing properly and so he was taken to the intensive care unit for five minutes. After Justin was returned to Ms. Bayas, they stayed in the hospital for three days; Justin was slightly jaundiced when he arrived home.

Around the end of December 2006, Ms. Bayas took Justin to the doctor to check on the jaundice; she was told that Justin was fine. Ms. Bayas was Justin's primary caregiver at this time. However, appellant would help care for Justin by feeding him, changing his diapers and giving him baths. Justin was never left in the care of anyone else. Sometimes, Ms. Bayas would leave Justin for about 30 minutes in appellant's care while she went to the grocery store. On occasion, appellant's eight year old daughter Karina would stay with Ms. Bayas and appellant. However, she did not take care of Justin. Ms. Bayas testified that Justin had never been dropped, nor had he fallen from furniture or his crib. Justin appeared to be a normal, healthy and happy baby; he did need his head supported when held and could not roll over on his own.

On the morning of January 31, 2007, when Justin was five and one half weeks old, appellant woke before Ms. Bayas and fed Justin. Ms. Bayas awoke between 9 a.m. and 9:30 a.m. She got ready to visit appellant's mother Barbara Martin in Hayward. Ms. Bayas and appellant, along with Justin, left the house around 10:30 a.m. Justin seemed happy. While at Ms. Martin's house the adults spent their time talking and playing with

---

[3]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

2

Justin; nothing unusual happened. Justin was fed and napped. Before appellant and Ms. Bayas left Ms. Martin's house at between 5:30 p.m. and 6 p.m., Ms. Bayas fed Justin one more bottle and changed his diaper. On the way home, Justin slept in the car until they hit some stop-and-go traffic near Milpitas. Justin cried every time the car stopped and would stop crying when the car moved again. Justin cried intermittently for about 30 minutes and spat out the pacifier that Ms. Bayas gave him.

Around 7 p.m. the family arrived home. Justin was asleep but woke up crying when Ms. Bayas and appellant took him inside. Ms. Bayas thought that Justin might be tired or hungry. She told appellant that she was going to go to the grocery store to get some more formula and some breakfast items. She handed Justin to appellant. Again, Justin was crying on and off. Ms. Bayas denied that Justin had been crying all day.

Ms. Bayas went to Safeway and Longs Drugs, which were five to 10 minutes from the house. While at the drug store, Ms. Bayas received a cellular telephone call from appellant. Appellant sounded scared and told her to hurry home because something was wrong with Justin. It took Ms. Bayas about five to six minutes to get home. Ms. Bayas could hear a siren as she neared the house, but she arrived home before the ambulance. The first thing that she saw when she entered the house was Justin on the couch not breathing with his face turning purple. Ms. Bayas asked appellant what had happened, but he was on the telephone and did not respond.

A telephone call to 911 was played for the jury. Ms. Bayas could be heard screaming and crying in the background. She testified that appellant was calm, but appeared scared. Appellant tried to breathe into Justin as instructed by the 911 operator. After around a minute, the fire department arrived. When the paramedics came they placed Justin in an ambulance. Ms. Bayas and appellant followed the ambulance to the hospital. At the hospital, Justin was not responding and appeared lifeless.

On or about February 3, 2007, Justin was declared brain dead and was disconnected from life support on February 6.

3

*Emergency Personnel*

When fire department personnel arrived at the Kovacevich home, appellant was performing CPR on Justin following directions from the 911 operator. The paramedics arrived sometime thereafter; appellant and Ms. Bayas told them that Justin had been crying on and off all day and was not acting appropriately; then, he stopped breathing. The paramedics took over administering CPR and gave him oxygen. They could not detect a pulse. They did not see any visible signs of trauma to Justin's body. The paramedics took Justin to Good Samaritan Hospital by ambulance.

*Medical Testimony*

Dr William Silva assisted the attending physicians in attempting to resuscitate Justin in the emergency room. Justin appeared lifeless and gray and was not moving or breathing; there were no signs of life. Dr. Silva noted extensive retinal hemorrhaging of Justin's eyes, which he explained was a rupture of blood vessels around the center of the eye. Dr. Ghelik, who was the first doctor to attend to Justin in the emergency room, confirmed the retinal hemorrhaging. Justin's pupils were widely dilated and nonreactive, suggesting severe brain dysfunction. Dr. Silva testified that retinal hemorrhaging is often associated with Shaken Baby Syndrome. Along with the retinal hemorrhaging, Dr. Silva saw that Justin's anterior fontanel (soft spot) was "bulging like an egg off the top of the baby's head and firm as a rock" which suggested to him that there was a "tremendous amount" of brain swelling. The combination of these two things suggested to Dr. Silva that Justin's injuries were caused by non-accidental trauma. No evidence of bruising or "bony" injury was apparent. As he continued his attempt to resuscitate Justin, Dr. Silva asked the paramedics to notify the police, who were at the hospital, of his concerns that Justin was the victim of child abuse.

Very briefly, Dr. Silva spoke with Ms. Bayas and appellant. They told Dr. Silva that Justin had been healthy before this event and that they had spent the day at the house of Justin's grandmother. Ms. Bayas and appellant told Dr. Silva that Justin had been

4

irritable, but they reported nothing unusual. They said that when they got home, Justin seemed to hold his breath and then stop breathing.

Dr. Silva's examination of Justin showed that he was comatose. Dr. Silva did not detect a heart murmur. Nor could he see anything abnormal or unusual on Justin's extremities except the blood flow into Justin's palms and soles was not normal. Dr. Silva saw no signs of neurologic functioning—no voluntary movement, no evidence of awareness—nothing that Dr. Silva would attribute to brain functioning. Justin's skin was cyanotic or blue. A CT scan of Justin's head showed multiple areas of hemorrhaging and swelling of the brain. Dr. Silva explained that in a six week old baby it is possible for brain swelling to occur rapidly. Chest X-rays showed that Justin's lungs were clear with no evidence of pneumonia or congestion. Justin had a high white blood cell count, which at the time, Dr. Silva attributed to either a stress response or a possible infection.

Based on his examination of Justin and all the test results, Dr. Silva concluded that Justin had "sustained severe brain injury of undetermined cause." Based on the totality of the circumstances presented to him, Dr. Silva suspected Shaken Baby Syndrome. In fact, he documented his suspicions in his report—"probable Shaken Baby Syndrome."

At trial, Dr. Joseph DiCarlo, a pediatric and critical care specialist at Good Samaritan Hospital, was qualified as an expert in pediatric intensive care and in the area of child abuse. Dr. DiCarlo cared for Justin for four days. Dr. DiCarlo noted that there were no external signs of injury on Justin's body, but he did observe the bulging fontanel and retinal hemorrhaging. The initial CT scans showed small areas of bleeding in Justin's brain, but the X-rays showed no fractures on the body. Justin was given broad spectrum antibiotics because tests showed there were two types of bacteria in his body. Dr. DiCarlo attributed Justin's initial high white blood cell count to the large amounts of epinephrine used in resuscitation attempts; his white blood cell count returned to normal a few hours later.

5

Within a day or two of his admission to the hospital, an EEG showed that Justin had no brain function. As noted, he was declared brain dead on February 3, 2007. Preliminarily, Dr. DiCarlo concluded that the cause of death was non-accidental trauma, sepsis or a combination of both. He suspected child abuse; all the signs showed that Justin was shaken or hit. However, he was uncertain whether Justin sustained a mild trauma and bled more due to his blood's very poor ability to clot. Dr. DiCarlo thought that Justin was a sick baby who just got sicker; he had a "nagging doubt" about Justin's clotting ability. Nevertheless, Dr. DiCarlo acknowledged that when he examined Justin and formed his conclusion he did not have the benefit of the autopsy findings that Justin had subarachnoid hemorrhaging, a subdural hematoma, and axonal damage. Dr. DiCarlo explained that the axonal damage could have not been caused by sepsis because it is caused by rapid movement, motion and impact, acceleration or deceleration. Dr. DiCarlo agreed that the pathologist would be in a better position to determine the cause of Justin's death. He agreed that in the absence of shaking and blunt force trauma, Justin would not have presented the "constellation" of injuries that he did.

Dr. Christopher Happy was the Santa Clara County Medical Examiner in 2007. At trial, he was qualified as in expert in pediatric pathology, neuropathology and anatomic pathology. Dr. Happy observed Justin while he was still on life-support at the hospital; he performed an examination of Justin's body. Subsequently, he performed the autopsy on Justin.

During Justin's autopsy, Dr. Happy discovered two areas of sub scalp hemorrhaging (deep bruising under Justin's scalp), which had gone through both the skin and scalp into the underlying ligament. He attributed these injuries to blunt force head injury. In addition, he observed bleeding in the subarachnoid membrane; bleeding was found on all sides of Justin's brain, which was extremely swollen. The brain was so swollen that the brain ridges were flattened and the brain was beginning to herniate or

6

push down into the hole at the base of the brain. He noted hemorrhaging around the optic nerve of Justin's eyes and there was hemorrhaging along Justin's spinal cord.

A microscopic examination of Justin's brain tissue and organs, as well as a microbiological study, revealed no evidence of disease, abnormalities or infection; no viral or bacterial organisms were found. The microscopic examination confirmed subarachnoid hemorrhaging, sheath hemorrhaging and retinal hemorrhaging. Dr. Happy discovered shearing damage to the axons that connect the brain nerve cells, which he attributed to blunt head injury involving sudden acceleration and deceleration. He noted that a person rarely survives this kind of injury.

Dr. Happy concluded that the cause of Justin's death was "[b]lunt force head injury" caused by a forcible impact against an "object that does not have a sharp edge." He opined that in "order for that hemorrhage to go through all the layers of the scalp and then into the firm ligamentous tissue underneath, a significant amount of force would have had to have been applied." Outside of child abuse, Dr. Happy had seen head injuries similar to Justin's injuries only from falls from great heights, such as 20-30 feet and from motor vehicle accidents involving great forces. The axonal injury indicated that great forces were involved. Dr. Happy concluded that Justin's death was the result of child abuse because the two different areas of bruising could not have been caused by a fall and at least two blows would have had to have been inflicted. He testified that due to the fact that there were two impact sites on the scalp, vigorous shaking alone would not have resulted in Justin's severe brain injury.

Although Dr. Happy found an unusually high blood alcohol level in Justin's blood, he attributed it to the postmortem process where naturally occurring bacteria in the body can ferment sugars into alcohol. In examining Justin's postmortem cultures Dr. Happy determined that Justin did not have sepsis and the bacteria that had been detected at the hospital were likely contaminants. He added that even if Justin had sepsis it did not explain his injuries, which could not have been caused by sepsis.

7

Dr. Happy opined that if Justin's injuries had been sustained approximately an hour and a half before Justin arrived at the hospital such a time frame was consistent with his findings. Further, there was no evidence Justin died of falling a short distance or from Sudden Infant Death Syndrome.

Dr. Michelle Jordan was qualified as an expert on anatomic and neuroforensic pathology at trial. At the request of the prosecution, she prepared at report regarding Justin's death. She did not examine his body, but did review Dr. Happy's report and all pertinent medical records and laboratory data.

Dr. Jordan agreed with Dr. Happy that the cause of Justin's death was "blunt impact of the head." Dr. Jordan did not find any evidence that Justin suffered any trauma during his birth; she rejected the theory that the cause of death was sepsis because the CT scan showed brain swelling from massive head injuries. Further examination showed that Justin had flame-shaped retinal hemorrhages that occur in child abuse cases and not as a result of CPR. Dr. Jordan did not exclude the possibility that someone had given Justin alcohol before he died; she ruled out the possibility that his high blood alcohol level was the result of postmortem decomposition because his body had not been decomposing.

After examining samples of Justin's brain under the microscope, Dr. Jordan concluded that Justin died from massive cerebral head trauma; Justin had a stroke because of the massive brain swelling. There was evidence in Justin's brain of significant acceleration and deceleration injuries. However, she was unable to say what kind of force was needed to cause Justin's injuries. Dr. Jordan confirmed that Justin's injuries were not consistent with just shaking, but concluded that there was some type of impact that occurred to his head, which caused the scalp bruising. In other words, he suffered a combination of shaking and impact—blunt trauma to the head from being thrown. Dr. Jordan opined that the manner of death was a homicide.

8

Dr. Katherine Albin was qualified as an expert in pediatric medicine and diagnosis of physical child abuse. Again, Dr. Albin was not involved in Justin's treatment, but independently reviewed Justin's entire history, medical records, diagnostic tests and autopsy results in order to determine if Justin's traumatic brain injuries were accidental or not. Based on her review of all the evidence, Dr. Albin concluded that the types of injury seen in Justin at the autopsy were a result of non-accidental abusive head trauma. She explained that the two areas of hemorrhaging on the inner layers of Justin's scalp suggested that there was impact to Justin's head. She opined that there was not one single mechanism associated with Justin's injuries; rather, there was shaking and perhaps impact or both. She agreed that there was evidence of blunt force trauma and that there was some impact against a firm surface and perhaps occlusion of Justin's airway. She opined that non-trivial force was used. Dr. Albin ruled out the notion that sepsis played any part in Justin's death, or was the result of a difficult birth. Further, there was no evidence that Justin sustained injury earlier in the day and then suddenly deteriorated; nor was there evidence that he had a prior head injury or older subdural hemorrhage.

A recording of a police interview of appellant was played for the jury. In the interview, appellant admitted to having shaken Justin hard because he was crying.

*Discussion*

*I. Alleged Error in Admitting Appellant's Statement to the Police*

Appellant moved in limine to suppress evidence of an interview he had given to Detectives Manion and Randol on February 2, 2007, on the ground that the interview was coerced and involuntary.[4] The court held an Evidence Code section 402 hearing at which Detective Randol testified about the circumstances of the interview. After watching a DVD of the interview, the court ruled that it was admissible. The court stated, "I just

---

[4] In addition, appellant sought suppression of the interview on the ground that he had not been given *Miranda* warnings. (*Miranda v. Arizona* (1966) 384 U.S. 436.) Appellant does not raise that issue on appeal.

9

don't see the coerciveness the cases talk about, nor do I see any promises of leniency. The only promise that the officers seem to be making was the promise of how telling the truth would unburden Mr. Kovacevich; sort of the-truth-shall-set-you-free type of thought. . . . [¶] . . . I didn't hear or see anything even implied with respect to that there was going to be punishment or leniency if Mr. Kovacevich didn't turn his story around."

During the trial, appellant objected to the playing of the recording for the jury, but the court overruled the objection "on the same ground as noted by the Court during the pretrial proceedings."

Appellant argues that the court's analysis of the interview was flawed. He asserts that the detectives employed a variety of improper coercive interrogation techniques to a degree that rendered his admissions involuntary as a matter of law and mandated that the interview be excluded from evidence. He contends that because of the importance of his admissions to the prosecution's case, he was prejudiced by the erroneous admission of the interview and that this court must reverse his convictions.

Due process requirements prohibit the use at trial of involuntary statements obtained by coercive police questioning. (*Colorado v. Connelly* (1986) 479 U.S. 157, 167; *People v. Benson* (1990) 52 Cal.3d 754, 778.) Accordingly, under both federal and state law, before a defendant's pretrial statement may be admitted into evidence, the prosecution has the burden of proving by a preponderance of the evidence that the statement was voluntary. (*Lego v. Twomey* (1972) 404 U.S. 477, 489; *People v. Sapp* (2003) 31 Cal.4th 240, 267.)

We apply a "totality of circumstances" test to determine the voluntariness of a confession. (*Withrow v. Williams* (1993) 507 U.S. 680, 693; *People v. Williams* (1997) 16 Cal.4th 635, 660.) Among the factors to be considered are " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical

10

condition [citation]; and mental health.' [Citation.]" (*People v. Williams*, *supra*, 16 Cal.4th at p. 660.) In other words, no single factor is dispositive.

A confession is voluntary if the suspect's decision to speak is entirely "self-motivated" because he freely and voluntarily chooses to speak without any form of compulsion or promise of reward. (*People v. Thompson* (1980) 27 Cal.3d 303, 327-328.) Lies told by the police to a suspect under questioning do not render the confession involuntary per se. The court must look to see whether the deception is reasonably likely to procure an untrue confession. (*People v. Farnam* (2002) 28 Cal.4th 107, 182.) Similarly, police trickery, by itself, does not render a confession involuntary (*People v. Thompson* (1990) 50 Cal.3d 134, 167), because subterfuge is not necessarily coercive. (*People v. Felix* (1977) 72 Cal.App.3d 879, 885-886.)

A trial court's determination of the voluntariness of a confession is reviewed de novo, while the trial court's historical findings of fact surrounding the confession are reviewed under the deferential substantial evidence standard. (*People v. Williams, supra*, 16 Cal.4th at pp. 659-660.) To the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence. (*People Weaver* (2001) 26 Cal.4th 876, 921.)

If the defendant is led to believe he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, the prosecution, or the court, in consideration of making the statement, even if truthful, such motivation is deemed to render the statement involuntary. (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) However, mere advice or exhortation that it would be better to tell the truth, when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary when the benefit pointed out is merely that which flows naturally from a truthful statement. (*Ibid*.)

During the interview, after steadfastly maintaining that he may have shaken Justin because he was limp and making a loud snoring noise, appellant finally admitted that he

11

shook Justin out of frustration because he was crying. Appellant maintains that this damaging admission was coerced because Detective Randol and Manion employed psychological coercion to overbear his will.

Appellant argues that the detectives used a three pronged approach in extracting his confession. First, the detectives assured him that it made no difference what he said because the forensic evidence had already told them everything they needed to know. Second, they made a succession of veiled promises that in return for telling them what they wanted they would use their influence with the criminal justice system to improve his position. Third, they assured him repeatedly that a confession that he had shaken Justin out of frustration would make things better for him, not worse.

" ' "The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citation.]" [Citation.] In determining whether or not an accused's will was overborne, "an examination must be made of 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' [Citation.]" [Citation.]' [Citation.] [¶] A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. . . . [Citations.] [¶] . . . Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 404-405.)

*The Circumstances of the Interview*

At the Evidence Code section 402 hearing, Detective James Randol testified that he had interviewed appellant in February 2007.[5] On February 2, Detective Randol met

_____

[5] At the time of the 402 hearing Detective Randol held the rank of Lieutenant. However, we refer to him as Detective for consistency and to avoid confusion.

12

with appellant at Good Samaritan Hospital in the ICU unit around mid-day and asked if he would go with him and Detective Manion to the police department to clarify some things. Appellant agreed to go with the officers; appellant was not handcuffed nor was he under arrest. The officers had received preliminary information about Justin's injuries from medical personnel relayed to them by the "Night Detective Unit." Further, the officers had spoken with an officer from the Family Violence Unit.

Once at the police station, appellant was taken to a small interview room; appellant was offered water. The officers left the room to make sure their recording equipment was working, then returned and started to interview appellant. Although the officers were direct and firm with appellant, there was no "yelling." Appellant was told that he was not under arrest and was free to leave at any time; appellant was told that after the interview he would be taken back to the hospital. In the middle of the interview, appellant was left alone in the room with the door unlocked.

Detective Randol testified that they did not make up evidence or confront appellant with anything that was false. Appellant was offered food and water twice; appellant did not request water at any time or request to take a break. The interview lasted approximately two hours. At the end of the interview appellant was taken back to the hospital. Our review of the DVD of the interview confirms these facts.

Appellant points to the following statements in arguing the officers used psychological coercion to extract a confession from him.

*Implied Benefit and Promises of Leniency*

The detectives told appellant "Every time a baby come[s] into the hospital, they document every sign and symptom. Every last minute detail. Okay? And what happened to Justin, uh [unintelligible] we know exactly what happened. . . . But what you're telling us, doesn't fit the science. Okay? It's just, it's impossible." Then, later, "It's about science and it's about you can't . . . dispute science in this case. The injuries that he has are not from his breathing. They're from being shaken. Period." Then, "In a

13

shaken baby case, absolutely 100%, they know what happened. Everyone knows what happened." Later they told him, "I think Dana's trying to . . . outsmart science. There's certain things you . . . can't do. It's like . . . if you leave your DNA on this doorknob and leave this room and then lie to somebody and say you were never here. Well, the DNA is gonna say you're here. The injuries this child has, paint the picture for us, okay?"

Appellant argues that these assertions were entirely deceptive, since no forensic examination had been conducted yet. Neither detective had spoken directly to any doctors at this point and Justin was still alive at this time and so no autopsy findings were available. Appellant asserts that as deceptive as the officer's statements were, the officers appeal to " 'the science' plainly communicated to appellant that there was no hope, as demonstrated by his comments in response to them that 'you guys have already condemned me then' and 'you're gonna lock me up and throw away the key.' "

We do not agree with appellant that the aforementioned statements were deceptive. The officers had information from both the Family Violence Unit and the night detectives working the case, who had relayed information from the medical personnel. A reasonable inference to be drawn from this is that the officers were informed that the medical personnel suspected that Justin had been shaken and that was the cause of his injuries.[6] More importantly, appellant was well aware that Justin's injuries were caused by him being shaken as evidenced by his statement, "[unintelligible] uh, they've already they told me that the majority of it was from me shaking him."

Even so, "the use of deceptive comments does not necessarily render a statement involuntary. Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is ' " 'of a type reasonably likely to procure an untrue statement.' " ' [Citations.] ' "The courts have prohibited only those psychological

---

[6]   At trial, Detective Randol testified that in fact he had spoken to Dr. Smyklo and possibly Dr. DiCarlo on the day before the interview with appellant and the information they relayed to him was that Justin's injuries indicated that he had been shaken.

14

ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 443.)

In this case, it is evident that the officers' comments did not overcome appellant's will. During this part of the interview, appellant did not exhibit any signs of distress. Significantly, it was not until later in the interview that appellant made his incriminating statements that he shook Justin because he was frustrated with his crying.

Appellant asserts that after leading him to believe they knew all the details of how he had shaken Justin, the officers began promising him that if he would only say how he had done it they would help him avoid a prison term. Appellant contends that the following statements from the officers illustrate his point.

"We want you to tell us the complete truth, cuz you told us about 95[%]. Okay? And we want to take it, and then present it . . . ." Later, they told him "We want to, we want to help you out dude." Appellant maintains that the following passage makes his point particularly clear. "It was a mistake, and we'll walk you through it dude. This; we'll help you through this process. This is a tough time. You already have one child who's 11, thank God. But we will walk you through this bro, but you've gotta take responsibility for what you did. You gotta be a man now, you gotta be a man, and quit trying to outthink everything, and just get if off your chest. Now. This is the time to do it. Cuz you're gonna have no other opportunity to do it bro. This is the opportunity we're giving you. We told you to come down here, speak to us; this is your chance to get it off your chest. And then . . . we'll take care of it from there bro." Appellant points out that one of the officers added, "You weren't thinking, but right now you're trying to think too much. Okay? We are actually on your side. We didn't come there with handcuffs and arrest you or anything like that. We believe that you had a story to tell, that you were gonna tell us the truth. And I'm glad you came down here to talk to us, but you need to

15

take advantage of this opportunity we're presenting to you right now . . . and tell us what happened."

Appellant argues that the "clear implication" of the foregoing is that the officers were promising him that things would go better for him if he confessed. Again, we disagree with appellant. The implication of the police advice was that it would be better for him to tell the truth; nothing in the foregoing remotely suggests that the officers were promising appellant that if he told the truth he would not be arrested and prosecuted for a crime. (*People v. Carrington* (2009) 47 Cal.4th 145, 174.)

Appellant asserts that the officers assured him that if he had shaken Justin out of frustration rather than in a deliberate attempt to kill him, it would be advantageous to him to admit it. Appellant asserts that the following statements illustrate his point.

"The two choices we have to come up with; did you plan to go over there and shake him? Or was it just frustration? (finger snap) That's; that is reasonable. That's a reasonable explanation. It happens to parents all over this country, probably on a daily basis. We get frustrated with our kids. You were frustrated." Later, one officer told appellant, "Now all we want to find out from you is if, you're an evil person, or you were just a frustrated parent. I believe you're a good guy, and I believe you're a frustrated parent. I don't believe you're the evil person"; and "you shook your baby for thirty seconds out of your life. Should people judge you for that the rest of your life?" In response to appellant's assertion that it was an accident and he did not mean to shake Justin so hard, one officer said, "Yeah but it was an accident cuz you lost, or temporarily lost control of what was going on. It's frustration man. We all, we experience it. There's nothing wrong with that. It doesn't make you a bad person. Okay?" Later, one officer stated, "It's not a big deal. You shook the baby. Okay? You pick up a two year old and you shake it, nothing happens. [Unintelligible] [B]ut it's a baby; you didn't know that. You didn't know that would happen. If you had known that would have happened, and you would have picked the baby up and shook him, I'd say . . . this is the most evil person

16

I've ever met in my life.  But you didn't know that if you picked up a baby and shook him, that this would cause this kind of injuries; otherwise you wouldn't have done it. Right? . . .  Am I correct?"

Again, we disagree with appellant that the foregoing illustrates that the officers were promising him leniency if he confessed.  It is entirely permissible for police to suggest possible explanations of the events and offer the suspect an opportunity to provide the details of the crime.  (*People v. Holloway* (2004) 33 Cal.4th 96, 115 [questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect].)  Certainly, the officers played to appellant's sense of guilt in having shaken Justin, but we see no reasonable person in appellant's position—someone who having steadfastly maintained that he shook his baby only after he discovered him limp and breathing strangely—suddenly confessing falsely to having shaken him out of frustration based on the officers' exhortations to tell the truth about how the incident happened.

Similar to the foregoing, appellant contends that the following was an implied promise of a benefit to him in that the jury would feel sorry for him.  "[J]ust like you put a bunch of citizens in a room, you tell em the two versions; your version where your child's in [unintelligible] distress, and you shake him.  Or the other version of what really happened.  What sounds more reasonable and who you gonna feel more compassion for? You're not gonna feel compassion for the person who says yeah, my child was in distress so I shook it.  You might feel compassion and most likely will for a person whose [*sic*] frustrated, and going through tough times."

The distinction that is to be drawn between permissible police conduct on the one hand and conduct deemed to have induced an involuntary statement on the other "does not depend upon the bare language of inducement but rather upon *the nature of the benefit* to be derived by a defendant if he speaks the truth, as represented by the police." (*People v. Hill* (1967) 66 Cal.2d 536, 549, italics added.)  Thus, "[w]hen the benefit

17

pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. (*Ibid*.) On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . ." (*Ibid*.)

As can be seen, the statement upon which appellant relies to argue that the officers made an implied promise of a benefit to him was not a benefit in the nature of more lenient treatment at the hands of the police, prosecution or the court.

Appellant relies primarily on *People v. Hogan* (1982) 31 Cal.3d 815 (*Hogan*) (disapproved on another point in *People v. Cooper* (1991) 53 Cal.3d 771, 836) in support of his position that the officers repeatedly promised him leniency and benefits if he confessed. In *Hogan,* the defendant was convicted and sentenced to death for murdering two members of a coworker's family. (*Hogan, supra*, at pp. 820-822.) The defendant had been interviewed three times by police and denied culpability during the first two interrogations. (*Id.* at p. 836.) Police interrogators had advised the defendant: " 'if there is a particular problem why this thing could have been committed let me know and if it's a mental problem, whatever it might be, maybe we can help you with this part of the treatment or you know what might happen.' " (*Id.* at p. 838.) By this and similar assertions, the police implied something worse would happen to the defendant if he did not admit a mental problem he did not have. Further, the officers instructed, " ' "Why don't you just tell us that you did it [and] then we'll get help for you," ' " which suggested that he would receive their help *only* if he confessed to committing the crime, whether he had actually committed it or not. (*Id.* at p. 839.) In addition, the officers repeatedly misrepresented that eye-witnesses had identified the defendant as the perpetrator, and repeatedly suggested he had a "mental problem." After several interrogations, they

18

finally convinced him that he had blacked out and perpetrated the homicide, prompting him into making incriminating statements while vomiting and sobbing uncontrollably. (*Id.* at pp. 838-840.)

The nature, intensity, and duration of the police conduct in *Hogan,* as well as the defendant's extreme emotional state at the time of his confession, are not comparable to the circumstances in appellant's case. Although in this case, understandably, appellant was concerned about his baby, the officers in *Hogan* repeatedly exploited defendant's weakness by promising him psychiatric treatment. (*Hogan, supra,* 31 Cal.3d at pp. 836-838.) The officers' comments here fall well short of the egregious misconduct in *Hogan,* where the defendant repeatedly expressed anxiety that he might be "crazy" and the police exploited that weakness by promising psychiatric treatment. (*Id*. at pp. 836–838.) None of the comments made by the officers can reasonably be characterized as coercive, or be said to constitute a motivating cause of appellant's subsequent confession.

Finally, appellant argues that under a totality of the circumstances analysis, this court must take into consideration that appellant was escorted out of the intensive care unit where his infant son lay dying; that the officers ruthlessly exploited appellant's vulnerability resulting from this circumstance; that the officers repeatedly suggested that Justin would think better of appellant if he confessed; and that the officers exploited his concern that his relationship with Ms. Bayas was going to crumble as a result of what happened by telling him Ms. Bayas might forgive him if he confessed, but would never do so if he maintained his innocence.

Appellant maintains the following statements suggested that Justin would think better of him if he confessed.

"What are you doing to Justin?" Plus, "your baby was there[;] your baby knows what happened. Right? [D]oes that mean anything to you? That you're basically . . . not telling the truth and Justin knows the truth. As weird as that sounds, he does. He knows he was crying and he knows you picked him up and shook him. Maybe to death." Later,

19

one officer said, "That is your boy.  And your boy deserves better.  You're speaking for Justin too.  You're speaking for that child cuz the child cannot speak."  Finally, one officer told him, "Be a man, and tell the truth.  For Justin.  He deserves it; right?  Doesn't he?  Can you do that for Justin?"

Any statement about a suspect's children during interrogation will certainly cause stress and worry to the suspect-parent, given the "primordial" relationship between parent and child.  (*United States v. Tingle* (9th Cir.1981) 658 F.2d 1332, 1336.)  Accordingly, bringing the issue of children into an interrogation is to be done with caution and care, if attempted at all.  Nevertheless, we must ask here, based on the totality of circumstances, whether the foregoing statements were likely to have overborne appellant's will such that he made a false confession.  We cannot say they did.  "No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence."  (*People v. Carrington*, *supra*, 47 Cal.4th at p. 174.)

Appellant points to the following to argue that the officers exploited his concern that his relationship with Ms. Bayas was going to crumble as a result of what had happened to Justin; and the "thrust of their interrogation on this point was that [she] might forgive him if he confessed, but would never do so if he persisted in maintaining his innocence."

"I never felt clean lying.  For me I'd just say man I fucked up.  Okay?  But you're going back in that hospital one of two ways.  That's straight up bro.  You're either; you're either a liar, a cold calloused liar who . . . probably's . . . killed your son.  Or you're gonna be the guy that says hey man; I fucked up.  I fucked up and I shook my baby when I shouldn't.  I didn't; I never knew; I, I just, I'd never thought, I just lost it but I never thought I would hurt my baby to that extent.  I wasn't trying to hurt your, your baby."

Appellant argues that the detectives were "clearly" telling him what he needed to say to Ms. Bayas to earn her forgiveness; and told him if he chose not to confess "We'll

20

write that bullshit story down. And it; you know what in the end? I'm gonna go over there and I'm gonna say hey you know what? Dana's a liar." However, after he expressed concern that he "want[ed] to be there for Joby," the officers told him "there's nothing to stop" it, that "Joby would want [him] to tell the truth." Then, after appellant said that he was not worried about the ramifications of what was going to happen next, one of the officers said that if appellant was going to explain things "with . . . this little cover-up" he would be "devastating" his relationship with Ms. Bayas.

Appellant argues that foregoing combined with the implication that he could avoid a prison sentence if he confessed, suggested that Ms. Bayas would never agree to continue her relationship with him unless he confessed.

Certainly, interrogations in which the police exploited a defendant's fear of losing his family to coerce a confession have been condemned. (See, e.g., *Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [oral confession made only after the police told the defendant that state financial aid for her infant children would be cut off, and her children taken from her if she didn't cooperate was involuntary]; *United States v. Tingle, supra,* 658 F.2d at p. 1334 [where the object of the interrogation was to cause the defendant to fear that, if she failed to cooperate, she would not see her young child for a long time, confession was coerced].) However in *People v. Kelly* (1990) 51 Cal.3d 931, an officer's statement, " 'I think it's . . . going to be a foregone conclusion you're going to be in prison for a lot of years. I don't know if your wife is going to stick around and wait for you. Okay. That's something you're going to have to work out with her' " was not coercive. (*Id*. at p. 952.) Viewed in context, we do not find the officers' statements were an implied threat that appellant's family would suffer adverse consequences if he did not confess or that the officers would keep him from his family unless he confessed. At most, the statements encouraged appellant to tell the truth for the sake of Justin and Ms. Bayas.

It is important to remember that appellant took full responsibility for shaking Justin from the beginning of the interview; the only question was whether his version of

21

events fit the medical evidence. Although appellant was confronted by the officers with the evidence, their appeal to him that Justin and Ms. Bayas would want him to tell the truth was on the lines of it would be better for him to unburden himself; they would think better of him if he did. None of the techniques used by the officers was so coercive as to result in a statement that was involuntary or unreliable.

"No single event or word or phrase necessarily determines whether a statement was voluntary." (*People v. Kelly, supra,* 51 Cal.3d at p. 950.) Given the totality of the circumstances, nothing in the record, including the DVD of the interview, suggests that appellant's will was overborne by the substance or manner of the interview. The officers spoke in calm even voices. They never raised their voices; and we see no evidence of threatening behavior by the officers. The interview lasted approximately two hours, with a break in the middle. "The business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means." (*People v. Jones* (1998) 17 Cal.4th 279, 297.)

In sum, we find that appellant's confession that he shook Justin out of frustration because he was crying was voluntary and was not the result of police coercion such that his will was overborne by the circumstances. We find the crucial element of coercive police conduct to be missing in this case. As such, at trial, it was not error to admit appellant's statements to the officers.

## II. *Sufficiency of the Evidence to Prove All Elements of Either Offense*

Appellant contends that the evidence adduced at trial was insufficient to prove all the elements of both offenses. He points out that he was convicted of second degree murder which requires proof that he acted with " 'malice aforethought.' (§187)" In addition, he was convicted of child abuse homicide, which requires that when he acted "he was aware of facts that would lead a reasonable person to realize that his act by its nature would probably result in great bodily injury to the child." Appellant argues that

22

because there was no evidence before the jury that demonstrated that he had either of these mental states at the time of the offense, this court should reverse his convictions.

In reviewing a defendant's challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence. Substantial evidence is evidence that is credible, reasonable, and of solid value, such that a reasonable jury could find the defendant guilty beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) The federal standard of review is to the same effect. (*Ibid*.) We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that support the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient to support a conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

*i. Child Abuse Homicide*

At the time appellant committed his crime section 273ab provided: "Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." (Stats. 1993-94, 1st Ex. Sess., ch. 47, § 1, eff. Nov. 30, 1994. Amended by Stats. 1996, ch. 460 (A.B. 2258), § 2.)[7]

"The elements of the offense are: '(1) A person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death.' [Citations.]" (*Wyatt*, *supra*, 48 Cal.4th at p. 780.)

---

[7] Currently, section 273ab, subdivision(a) provides "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." (Stats.2010, ch. 300, § 1.)

"[A] defendant may be guilty of an assault within the meaning of section 273ab if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act. [Citation.] The defendant, however, need not know or be subjectively aware that his act is capable of causing great bodily injury. [Citation.] This means the requisite mens rea may be found even when the defendant honestly believes his act is not likely to result in such injury. [Citation.]" (*Wyatt*, *supra*, 48 Cal.4th at p. 781.)

Appellant argues that the evidence was insufficient to prove that *he knew* any facts that would lead a reasonable person to believe that the acts would result in great bodily harm to Justin. Appellant maintains that in *Wyatt*, our Supreme Court acknowledged that there is a subjective component to the mens rea element of the offense of child abuse homicide. Specifically, appellant cites to the following in *Wyatt* to support his argument. "[T]he assault element of a section 273ab offense requires an intentional act and the *actual knowledge* of those facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from the act." (*Wyatt*, *supra*, 48 Cal. 4th at p. 786, italics added.) Appellant contends that this means that he cannot be convicted based on facts he did not know but should have known, and there is no evidence in the record that he actually subjectively knew facts from which a reasonable person would infer that his conduct was likely to injure Justin. He argues that all that was before the jury on the point of what facts were known to him was his simple admission that he had shaken Justin; and the evidence strongly suggests that he did not know that he was shaking Justin hard enough to warrant a reasonable person's conclusion that it might result in harm. In essence, appellant's claim is that the evidence we recited above does not show that *he* was aware of the nature of his act of shaking Justin with respect to the *amount of force* he employed. We are not persuaded by appellant's argument.

In *People v. Williams* (2001) 26 Cal.4th 779 (*Williams*), the court held that a defendant was not guilty of an assaultive crime unless he or she was "aware of the facts

24

that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*Id.* at p. 788.)

In *Wyatt*, the Court of Appeal had acknowledged *Williams's* articulation of the mens rea standard was pertinent to the sufficiency-of-the-evidence inquiry. Specifically, the Court of Appeal had framed the issue as follows: " '[W]hat is in question here is whether there was substantial evidence that [defendant] "was *aware of facts* that would lead a reasonable person to realize that [his] act by its nature would directly and probably result in great bodily injury to the child." ' (Italics added.) But in finding the evidence insufficient on this point, the court emphasized that there was no evidence showing defendant had *actual* knowledge he was wrestling far too hard with his son, and that 'it never occurred to [defendant] that he was hurting Reginald.' As for defendant's tape-recorded statements that he wasn't thinking or paying attention while play-wrestling with Reginald, the court interpreted them as merely demonstrating defendant's 'attempt to understand how he could have struck his son hard enough to fatally injure him without knowing he was doing it.' " (*Wyatt*, *supra*, at p. 785.)

Our Supreme Court found that "[t]his reasoning cannot be reconciled with the long-standing rule, reiterated in *Williams,* that 'assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur.' [Citations.] Thus, [the Supreme Court concluded] any failure on defendant's part to realize he was hurting and fatally injuring Reginald is of no consequence to the issue at hand." (*Wyatt, supra,* at p. 785.)

Appellant's argument simply restates that which *Williams* and *Wyatt* declared irrelevant: a subjective awareness of the *risk of injury.* (*Williams*, *supra*, 26 Cal.4th at p. 790; *Wyatt*, *supra*, at p. 785.) Without doubt, appellant was guilty of assault under *Williams.* He committed an act that would probably and directly result in the application of force to the victim. Child abuse homicide is simply an assault with a more egregious injury than the mere battery of which a defendant does not need to be subjectively aware

25

under *Williams.* As a result, the amount of force is not among the circumstances relating to the nature of his action of which a defendant must actually be aware at the time he undertakes the act of shaking a child.

Appellant's own statements furnished substantial evidence that he intentionally acted to shake Justin; by his own account, appellant was fully aware he had shaken Justin. On this record, we have no difficulty concluding that there was substantial evidence that when appellant acted he was aware of facts (he was shaking his baby) that would lead a reasonable person to realize that his act by its nature would probably result in great bodily injury to Justin.

Similar to *Wyatt*, the record contains substantial testimonial and medical evidence that appellant intentionally shook his son in a manner that would lead a reasonable person to realize great bodily injury would likely result. (*Wyatt*, at p. 786.) Contrary to appellant's argument, *he* did not need to know that he was applying extreme and prolonged physical force to Justin. The nature of Justin's injuries shows that significant force was used. This is sufficient to establish that, when appellant acted, "he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly, and probably result in great bodily injury to the child." (CALCRIM No. 820.)

Accordingly, we conclude that there was substantial evidence that appellant had the requisite mental state for child abuse homicide.

*ii. Murder*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)

Malice may be either express or implied. (*People v. Taylor* (2010) 48 Cal.4th 574, 623.) Express malice is an intent to kill. (§ 188; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) "Malice will be implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who

26

acts with conscious disregard for life. [Citations.]' [Citations.]" (*People v. Taylor, supra,* 48 Cal.4th at pp. 623–624.) "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).)

Appellant argues that there was insufficient evidence to support a finding of malice to support his second degree murder conviction.

As our Supreme Court pointed out in *Knoller*, the great majority of that "court's decisions establish that a killer acts with implied malice . . . when acting with an awareness of *endangering human life.*" (*Knoller, supra,* 41 Cal.4th at p. 153.)

We find such evidence in this case. Appellant admitted to the police that he was aware that shaking a baby could endanger that baby as evidenced by the following conversation:

"Q [Detective]: Okay. So you didn't know what to do. So you were, and you, and you were a newer father again. Okay? Did you know that shaking a baby could kill him?

A [Appellant]: I've heard of it, yeah.

Q Where did you hear of it?

A TV."

Accordingly, we conclude that the mental component of implied malice was satisfied—i.e. appellant knew that his conduct in shaking Justin endangered Justin's life, but nevertheless he acted in conscious disregard for Justin's life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181 [mental component of implied malice is satisfied if the defendant knows that his conduct endangers the life of another and acts with a conscious disregard for life].)

*III. Failure to Instruct on Voluntary Manslaughter*

The court instructed the jury on involuntary manslaughter as a lesser included offense of murder. However, the jury was not instructed on voluntary manslaughter, in fact they were specifically instructed that "voluntary manslaughter is not for you to

27

consider in this case." Appellant contends that he was deprived of his due process rights under the Sixth and Fourteenth Amendments. Appellant argues that there was ample evidence to support a jury finding that he had acted without the appropriate mental state to support a conviction of either murder or child abuse homicide.

As noted, "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) When an unlawful killing occurs "upon a sudden quarrel or heat of passion" (§ 192, subd. (a)) the killer lacks malice, and the crime is voluntary manslaughter, a lesser offense necessarily included within the crime of murder. (See *People v. Moye* (2009) 47 Cal.4th 537, 549.) A trial court is obliged to instruct on lesser included offenses so long as they are supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

Last year, the California Supreme Court summarized the rules applicable to this issue:

" 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' [Citations.] 'That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' [Citations.] 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.' [Citations.] [¶] ' "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.' " [Citation.] This substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak,' " but rather by evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." [Citation.] "On appeal, we review independently the question whether the trial court

failed to instruct on a lesser included offense." [Citation.]' [Citation.]" (*People v. Souza* (2012) 54 Cal.4th 90, 115–116.)

It has been said that "[w]here [as here] a defendant 'denies any complicity in the crime charged, and thus lays no foundation for any verdict intermediate between "not guilty" and "guilty as charged" . . . [¶] . . . it is error to so instruct [on the lesser offense] because to do so would violate the fundamental rule that instructions must be pertinent to the evidence in the case at bar.' [Citation.]" (*People v. Trimble* (1993) 16 Cal.App.4th 1255, 1260.) Due to the fact that jurors "are not required to make a binary choice between the prosecution evidence and the defense evidence," however, "if the evidence as a whole would support a third scenario, the trial court may be required to give instructions on that scenario. [Citation.]" (*People v. Hernandez* (2003) 111 Cal.App.4th 582, 589–590; see *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016–1017 [examining whether defendant was entitled to instructions on voluntary manslaughter based on circumstantial evidence, even though defendant denied shooting victim or even being armed].)

Malice is presumptively absent, and the crime constitutes voluntary manslaughter, when a defendant, "kills 'upon a sudden quarrel or heat of passion' [citation], provided that provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment. [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1086.)

In *People v. Garcia* (2008) 162 Cal.App.4th 18 (*Garcia* ), the appellate court stated "[a]n unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter." (*Id.* at p. 22.) Relying on this conclusion, appellant contends that as to the child abuse homicide charge, the jury should have been instructed on voluntary manslaughter.

In *Garcia,* the victim and defendant were involved in a confrontation. The victim moved toward or lunged at the defendant, who was then holding a shotgun. Concerned

29

the victim might try to take the shotgun, the defendant swung at the victim with the butt of the gun in order to make the victim back up, but the gun struck the victim in the face. This caused the victim to fall and hit his head on the sidewalk, causing him to die from the injuries sustained in the fall. (*Garcia, supra,* 162 Cal.App.4th at pp. 22–23, 25.) The defendant asserted he did not purposefully hit the victim in the face and did not intend to kill him. The jury was instructed on the crimes of murder and the lesser included offense of voluntary manslaughter, and the jury acquitted the defendant of murder but found him guilty of voluntary manslaughter. (*Id.* at pp. 23–26.)

On appeal, the defendant in *Garcia* claimed the trial court committed prejudicial error in refusing to instruct the jury on *involuntary* manslaughter as a lesser offense of murder. The defendant argued such instruction was required because there was substantial evidence the killing "was committed without malice and without either an intent to kill or conscious disregard for human life and, therefore, was neither murder nor voluntary manslaughter." (*Garcia, supra,* 162 Cal.App.4th at p. 26.) The argument in *Garcia* was limited to whether evidence showing an unintentional killing without implied malice during commission of an inherently dangerous felony could support an instruction for *involuntary* manslaughter. The *Garcia* court rejected that claim, concluding an "unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is *at least* voluntary manslaughter." (*Id.* at p. 31, italics added.) The statement from *Garcia* upon which appellant relies was dictum, because the holding was that the defendant in *Garcia* was not entitled to an *involuntary* manslaughter instruction. (*Id.* at p. 32.)[8]

---

[8]    Whether voluntary manslaughter may be premised on a killing without malice that occurs during commission of an inherently dangerous assaultive felony is an issue pending before the California Supreme Court. (*People v. Bryant* (2011) 198 Cal.App.4th 134, review granted Nov. 16, 2011, S196365.)

Even if the theory articulated in *Garcia* is ultimately recognized as a valid basis for a voluntary manslaughter instruction, the *Garcia* theory of voluntary manslaughter requires the killing be committed *without* malice.[9] (*Garcia*, *supra*, at p. 32.)

Here, the evidence demonstrated appellant shook Justin with such great force that his brain was so badly damaged that the ridges were flattened from the swelling and there was extensive deep bruising under the scalp. Even if the *Garcia* theory survives Supreme Court review, there was no evidence from which a rational jury could have concluded appellant's intentional act of shaking Justin was done without appellant harboring at least implied malice because there was no evidence that such a forceful act was not an intentional act whose natural consequences are dangerous to human life; nor was there any evidence appellant did not act with a conscious disregard for human life posed by such an act when he violently shook Justin. (*Knoller, supra,* 41 Cal.4th at p. 157.) Accordingly, as to the child abuse homicide charge, the trial court had no sua sponte duty to instruct the jury with the theory of voluntary manslaughter referred to in *Garcia*.

As to the murder charge, "[a]lthough section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of

---

[9]    Well established principles limit voluntary manslaughter to an unlawful killing upon sudden quarrel or heat of passion or in an actual, but unreasonable, belief in the need to defend against imminent death or great bodily injury. (§ 192, subd. (a); *In re Christian S.* (1994) 7 Cal.4th 768, 783.) The trial court in *Garcia* so instructed, and the jury convicted the defendant of voluntary manslaughter, apparently based upon one of the two recognized theories (*Garcia*, *supra*, at pp. 23, 25); we do not believe that the appellate court intended to add a new category of offense constituting voluntary manslaughter.

31

average disposition to act rashly or without due deliberation and reflection. [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

"Thus, '[t]he heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As [our Supreme Court] explained long ago in interpreting the same language of section 192, "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." [Citation.]' [Citations.] [¶] ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " [Citation.]' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

As to the murder charge, appellant's argument that a voluntary manslaughter instruction should have been given is based on the premise that it was for the jury to decide whether Justin's crying was sufficient provocation to reduce that crime to manslaughter. Appellant asserts that the specific question of whether a baby's crying can constitute provocation sufficient to reduce murder to manslaughter is one of first impression in California.

Appellant cites to a 1986 English case, *Regina v. Doughty* (1983) 83 Cr.App.R. 319, for the proposition that the question of whether a baby's crying is sufficient

provocation is a jury question. (*Id*. at p. 326.) Appellant's argument ignores the fact that before the issue of sufficient provocation goes to the jury, there must be evidence "substantial enough to merit consideration" by the jury. (*Breverman*, *supra*, 19 Cal.4th at p. 153.) The determination of whether there is evidence substantial enough to merit jury consideration is vested in the trial court. (*People v. Prince* (2007) 40 Cal.4th 1179, 1265 [it is the court that is vested with authority to determine whether to instruct on a lesser included offense and instructions on lesser included offenses are required only when the evidence that the defendant is guilty of the lesser offense is substantial enough to merit consideration by the jury].)

As respondent points out, the record is devoid of evidence that Justin's crying was sufficient to provoke appellant to kill him in the heat of passion. There was no evidence that appellant was exhausted, or mentally broken down, or that the baby's crying had been persistent and unbearable. To the contrary, the evidence showed that Justin had not been crying all day, but napped and ate normally throughout the day. It was only on the drive home that Justin began to cry, but that was just intermittently. Appellant was alone with Justin for less than an hour while Ms. Bayas was at the store; and appellant knew that she was due to return within a short amount of time. On this record, we cannot say that an ordinary person of average disposition in the same situation would have reacted rashly or without due deliberation and reflection—from passion rather than from judgment. (*Manriquez*, *supra*, 37 Cal.4th at pp. 583-584.)

Even if we were to assume for the sake of argument that there was evidence that appellant's passions were aroused, no rational juror could have found that a *reasonable* person in appellant's situation would have been provoked to kill his child; sound policy considerations militate against even adopting the premise of appellant's contention that aggravation caused by a vulnerable and defenseless child posing no threat to a defendant could create feelings of homicidal rage or passion in an ordinarily reasonable person so as to negate the malice component of murder.

33

In sum, nothing in the evidence required the trial court to instruct on voluntary manslaughter. Or stated another way, the record contains absolutely no evidence to suggest that appellant killed his five-week-old son in response to objectively reasonable provocation.

*IV. Denial of Defense Request to Clarify the Mens Rea Requirement for Child Abuse Homicide in Closing Argument*

With regard to the child abuse homicide charge, the jury was instructed pursuant to CALCRIM No. 820 that "When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in great bodily injury to the child."

Defense counsel proposed to point out to the jury that while this element does not require a defendant to be subjectively aware that his actions will harm the child, "it does require that he be aware of facts that would lead a reasonable person to realize how dangerous his conduct can be." Specifically, defense counsel wanted to show a slide to the jury during summation that stated, among other things, that "[a] defendant may not be convicted [based on] facts he did not know, but should have known." The court refused to allow defense counsel to use this language on the slide or argue this to the jury.[10]

Appellant maintains that the court's refusal to clarify a complicated legal issue that went directly to the heart of his case deprived him of his Sixth and Fourteenth Amendment right to counsel.

Appellant's claim of constitutional error is based primarily on *Herring v. New York* (1975) 422 U.S. 853, 859 (*Herring*), which held that "a total denial of the opportunity for final argument in a nonjury criminal trial is a denial of the basic right of the accused to make his defense." As the high court explained in *Herring*,"closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial" and

---

[10] Appellant concedes that he did not request that the court instruct the jury with the disputed passage.

"counsel for the defense has a right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge." (*Id.* at p. 858.) Here, of course, there was no such total denial.

Moreover, as the high court cautioned, the *Herring* rationale was not intended to prevent trial courts from controlling the scope of closing arguments: "This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion." (*Herring, supra,* 422 U.S. at p. 862; see also *People v. Marshall* (1996) 13 Cal.4th 799, 854-855 [a criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact but this right is not unbounded, the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark].)

The defense theory in this case was that appellant was coerced into saying that he shook Justin, that it was, in fact, Ms. Bayas that assaulted Justin. A defendant's right to counsel is denied where the court seriously limits defense closing argument, as by precluding reference to an entire theory of defense (*Conde v. Henry* (9th Cir.1999) 198 F.3d 734, 739), or preventing counsel from arguing the significance of evidence critical to a theory of defense (*United States v. Kellington* (9th Cir.2000) 217 F.3d 1084, 1099-1100).

Contrary to appellant's argument, such a denial did not occur in this case. The court did not limit counsel's argument on the crux of the defense theory: that appellant did not cause Justin's injuries and Ms. Bayas was in fact the perpetrator.

35

*Conde v. Henry, supra,* 198 F.3d 734, cited by appellant, does not require a contrary finding. In *Conde,* the defendant was charged with robbery, kidnapping for robbery, kidnapping for extortion, residential burglary, and commercial burglary. Apparently, the defendant had two inconsistent theories of the case: first, that he was innocent of all charges; second, that he was guilty of kidnapping for burglary but not kidnapping for robbery. (*Id.* at p. 739.) At the conclusion of the prosecution's case, the trial court granted the defendant's motion for acquittal on robbery and on kidnapping for extortion. In dismissing the robbery charge, the court stated that it did not see any evidence that there was an intent to take anything from the victim. (*Id.* at p. 737.) In addition, the court stated that it believed that the prosecution's evidence would support a conviction of kidnapping for robbery, but it would not support a conviction of kidnapping for burglary or of simple kidnapping. Accordingly, the court prohibited defense counsel from presenting any evidence that the defendant was innocent of any intent to rob and further denied a defense request for instruction on the lesser offense of simple kidnapping. (*Id.* at pp. 739-740.) The jury found the defendant guilty of kidnapping for robbery, residential burglary, and commercial burglary. (*Id.* at p. 738.) The federal court held in part that "[b]y preventing Conde from arguing [his theory of the case] that no robbery had occurred and that he lacked the requisite intent to rob, the trial court's order violated the defendant's fundamental right to assistance of counsel and right to present a defense, and it relieved the prosecution of its burden to prove its case beyond a reasonable doubt." (*Id.* at p. 739.)

In *Conde,* the defense had two inconsistent theories of the case and the trial court's ruling erroneously precluded defense counsel from presenting evidence on and arguing one of his alternative theories. (*Conde, supra,* 198 F.3d at p. 739.)

In contrast to *Conde*, in this case, the court did not preclude defense counsel from arguing that appellant did not have the requisite mental state to sustain a conviction on child abuse homicide. In fact, in closing, defense counsel pointed out to the jury that to

find that his client committed child abuse homicide they were required to find that appellant "was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in great bodily injury to the child. This requires an actual awareness or knowledge of those facts." Appellant had a fair opportunity to present whatever evidence he had that would indicate the absence of the required mental state, and he had a fair opportunity to have the facts in the case argued to the jury. As such, we conclude that appellant was not denied the right to counsel during closing argument by the court's limitation on counsel's closing argument.

*V. Alleged Deficient Reasonable Doubt Instruction*

Before the court instructed the jury, defense counsel asked the court to modify CALCRIM No. 220, the instruction on reasonable doubt, to include an instruction that as to both offenses "every element has to be proven by proof beyond a reasonable doubt." The court declined the request.

Appellant argues that by failing to instruct that a defendant may not be convicted of an offense unless each element of it has been proved beyond a reasonable doubt, the court deprived appellant of his right to due process under the federal Constitution. We reject appellant's assertion that there was a federal due process violation in this case.

We determine whether a jury instruction correctly states the law "under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] " (*Ibid.*) As the Third District Court of Appeal has explained "[w]hether an instruction correctly conveys this [reasonable doubt] standard must be determined by examining the instruction in the context of all the instructions given the jury." (*People v. Wyatt* (2008) 165 Cal.App.4th 1592, 1601, citing *Victor v. Nebraska* (1994) 511 U.S. 1, 5.)

Certainly, the United States Supreme Court in *U.S. v. Gaudin* (1995) 515 U.S 506, 522-523, stated: "The Constitution gives a criminal defendant the right to have a jury

37

determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." Nevertheless, the United States Supreme Court has concluded that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." (*Victor v. Nebraska, supra,* 511 U.S. at p. 5.)

The *Ramos* court noted that the defendant had not cited "any California or United States Supreme Court authority holding" that the "each element" language in a reasonable doubt instruction "is constitutionally required." (*Ramos, supra,* 163 Cal.App.4th at p. 1090, fn. omitted.) The *Ramos* court explained: " ' "[W]e must . . . assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' " (*Ramos supra,* 163 Cal.App.4th at p. 1088.)

Recent California case law on this exact issue upholds the revised version of CALCRIM No. 220 as legally adequate when, as in the present case, the jury was also instructed regarding the need to prove each element of the underlying offense. (See *People v. Riley* (2010) 185 Cal.App.4th 754, 770 (*Riley*); *People v. Henning* (2009) 178 Cal.App.4th 388, 405-406 (*Henning*); *Ramos, supra,* 163 Cal.App.4th at pp. 1088-1089; and *People v. Wyatt, supra,* 165 Cal.App.4th at p. 1601.)

In 2010 the Court of Appeal in *Riley* cited *Ramos* in support of its ruling: "The CALCRIM No. 220 instruction—which informs the jury that when the court says that the People must prove something, the People must prove it beyond a reasonable doubt, combined with the court's instruction that the People must prove each element of the offense (which is given whenever the court instructs on the elements of an offense), adequately informs the jury that it must find that each element has been proved beyond a reasonable doubt." (*Riley, supra,* 185 Cal.App.4th at p. 770.) In *Riley,* the trial court gave an instruction enumerating the elements of the underlying offense, in addition to CALCRIM No. 220. (*Id.* at pp. 768-769.)

In *Henning* the court affirmed its decision in *People v. Wyatt* that CALCRIM No. 220 " 'viewed together with other instructions, correctly informed the jury that the

prosecutor was obliged to prove each element of the crimes beyond a reasonable doubt.' " (*Henning, supra,* 178 Cal.App.4th at p. 406; *People v. Wyatt, supra,* 165 Cal.App.4th at p. 1601.)

The trial court in *Ramos* gave the CALCRIM No. 220 instruction, and, as in the present case, gave an additional instruction that "enumerate[d] each of the elements of the charged crime and the special allegation, and stated that the People were obligated to prove each of those elements in order for defendant to be found guilty." (*Ramos, supra,* 163 Cal.App.4th at p. 1089, fn. omitted.) The *Ramos* court found the "instructions, taken as a whole, adequately informed the jury that the prosecution was required to prove each element of the charged crime beyond a reasonable doubt." (*Ramos, supra,* 163 Cal.App.4th at p. 1089.)

In the present case, the trial court gave CALCRIM No. 220 (the reasonable doubt instruction) as well as CALCRIM No. 520, which enumerated the elements the prosecution was required to prove to find appellant guilty of murder (§ 187) and CALCRIM No. 820, which enumerated the elements the prosecution was required to prove to find appellant guilty of child abuse homicide (§ 273ab).

Examining the adequacy of the instructions in this case, in the context of all of the instructions given the jury, we conclude the jury was properly instructed that the prosecution was required to prove every element of the charged offense beyond a reasonable doubt.

We are not persuaded by appellant's reliance on *People v. Vann* (1974) 12 Cal.3d 220 (*Vann*); *People v. Mayo* (2006) 140 Cal.App.4th 535 (*Mayo*) and *People v. Flores* (2007) 147 Cal.App.4th 199 (*Flores*). The *Ramos* court correctly found *Vann* and *Flores* inapposite because they "reversed criminal convictions based on the trial court's failure to instruct the jury at the conclusion of the trial regarding the presumption of innocence, and its omission from the posttrial jury instructions of any instruction defining reasonable

doubt. [Citation.] Neither of these defects is present in this case." (*Ramos, supra,* 163 Cal.App.4th at p. 1089.) Nor is either defect present here.

If anything, *Mayo* is less supportive of appellant's position. In *Mayo,* the Court of Appeal concluded that other instructions adequately instructed the jury on the reasonable doubt standard despite the court's inadvertent failure to give a specific instruction on the definition of reasonable doubt. (*People v. Mayo, supra,* 140 Cal.App.4th at pp. 539, 541–545.) As noted in *Ramos,* while the use of language informing the jurors that the prosecution must prove each element of the charges beyond a reasonable doubt may be appropriate, apparently no case has held that it is mandatory. To the contrary, our Supreme Court has said: "It would be correct to instruct that the People must prove every element of the offense beyond a reasonable doubt, but a defendant is not entitled to that instruction." (*People v. Ochoa* (2001) 26 Cal.4th 398, 444, fn. 13, disapproved on another point in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14; accord, *People v. Osband* (1996) 13 Cal.4th 622, 678.)

Appellant attempts to distinguish *Ramos*, and then asserts that it was wrongly decided. Appellant's attempt to distinguish *Ramos* is unavailing. Citing to footnote four from the *Ramos* opinion,[11] appellant argues that in *Ramos*, it was the giving of CALCRIM No. 220 in addition to the court telling the jury the enumerated elements of the crimes that the prosecution had to prove, in addition to "AND" between the enumerated elements that the court found adequately informed the jury that they had to find each element proven beyond a reasonable doubt. Here, in contrast, the court did not separate the elements of either of the two offenses with "AND" with the exception of the penultimate and final elements. We find this argument to be bordering on being frivolous. Nothing in the *Ramos* opinion remotely suggests that the decision rose and fell on the presence of "AND" in the enumeration of the elements of the crimes.

---

[11]     In footnote four, the *Ramos* court gave an "example" of how the jurors were instructed. (*Ramos*, *supra*, at p. 1089.)

Furthermore, we do not believe that *Ramos* was wrongly decided. We agree with the *Ramos* court that "While we do not doubt that the use of [the] language [that appellant requested here] is appropriate [citation], defendant has not cited any California or United States Supreme Court authority holding that it is constitutionally required." (*Ramos, supra,* 163 Cal.App.4th at p. 1090, fn. omitted.)

We note that in closing argument defense counsel, while discussing the concept of reasonable doubt, explained to the jury that the reasonable standard not only applied to the case as a whole, but also to "every element in the case." Defense counsel explained "So not just to the case as a whole, but when you look at different elements, for example, for the main child abuse charge in CALCRIM 820, the causation of death, death would not have occurred except for the defendant's actions. [¶] When you look at that and look at the other evidence, you have to find that element true by proof beyond a reasonable doubt. You have to do that for each and every element of the crimes." Given that neither the court nor the prosecutor challenged defense counsel on this proposition, any doubt in the jurors' minds that the "something" in the phrase—whenever I tell you the People must prove something, I mean prove it beyond a reasonable doubt—did not apply to the elements of the crimes would have been dispelled.

Moreover, appellant's assertion that "something" could be understood to mean the crime as a whole, rather than the elements of each crime, strains credulity in light of the common meaning of the language. No other reasonable interpretation could be placed on the court's instructions that "whenever" the People were required to prove "something," coupled with the "People must prove" followed immediately with a laundry list of elements, that each such element was a "something" to be proved beyond a reasonable doubt.

Accordingly, we reject appellant's argument that there was a federal due process violation.

41

## VI. Cumulative Error

Under some circumstances, several errors that are each harmless on their own should be viewed as prejudicial when considered together. (*People v. Hill* (1998) 17 Cal.4th 800, 844, overruled on a different ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13).) Since we have found none of appellant's claims of error meritorious, a cumulative error argument cannot be sustained. No serious errors occurred, which whether viewed individually or in combination, could possibly have affected the jury's verdict. (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez* (2004) 32 Cal.4th 73, 128.) To put it another way, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

## VII. Restitution Fine

In sentencing appellant, the court imposed a "restitution [fund] fine of $10,000 . . . under the formula permitted by . . . section 1202.4 (b)."

Appellant asserts that in applying this formula it is quite apparent that the court violated section 654; and the correct value of the restitution fine under this formula is $5000.

Initially, we note that the lack of an objection by trial counsel to the amount of the restitution fund fine does not constitute a forfeiture of the section 654 issue. "It is well settled . . . that the court acts 'in excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654" and therefore a claim of error under section 654 is not forfeited by failure to object. (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)[12]

---

[12]    Having determined that this issue is cognizable on appeal despite the lack of an objection below, we need not address appellant's claim that his trial counsel was ineffective in failing to challenge the amount of the fine.

Under the formula permitted by section 1202.4, subdivision (b) a restitution fund fine "*may*" be calculated as "the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (§ 1202.4, subd. (b)(2), italics added.)[13]

We recognize that the ban on multiple punishments under section 654 applies to restitution fines under section 1202.4. (*People v. Le* (2006) 136 Cal.App.4th 925, 933 (*Le*), citing *People v. Hanson* (2000) 23 Cal.4th 355, 361 [the Legislature intended restitution fines as punishment].) In *Le,* this court held the trial court erred when it used a felony conviction for burglary that was stayed under section 654 to calculate the amount of the restitution fine under section 1202.4, subdivision (b)(2). (*Le, supra,* 136 Cal.App.4th at p. 933.)

Respondent concedes that the court erred in using the stayed murder count in the formula to calculate the fine, but requests that we remand this case to the trial court because "it cannot be concluded" that the court would have imposed a restitution fine of $5000 ($200x25x1) if the court had been aware that the use of the murder conviction for which the sentence was stayed was barred by section 654.

We are not persuaded by either appellant's or respondent's position. We believe that appellant relies too much on the trial court's invocation of the word "formula." Section 1202.4 provides that the trial court enjoys discretion to set the fine amount based on the offense's seriousness. (§ 1202.4, subd. (b)(1).) Not many offenses are more serious than a child abuse homicide. The record makes plain that the court meant to sentence appellant under subdivision (b)(1) of Penal Code section 1202.4 because the

---

[13]    At the time appellant committed his crime in 2007 the minimum fine referred to in section 1202.4, subdivision (b)(1) was $200. (Stats. 2005, ch. 240, § 10.5.) Applying the formula in section 1202.4, subdivision (b)(2) the only way to get to $10,000 would be the 25 years on count one, multiplied by $200, multiplied by the number of counts (two) to arrive at a calculation of $200x25x2.

court made no effort to engage in any years-based calculation of the type offered in subdivision (b)(2) of that section. Moreover, the probation report recommended a $10,000 fine while making a brief reference to the "formula"[14] but made no attempt to calculate the amount according to the specific formula set forth in section 1202.4, subdivision (b)(2).

Although in *Le* we found, as we do here, that section 654 applied in the defendant's favor and, having done so, we reduced the restitution fine according to the reduction in years of sentence and the number of felonies to which the fine applied (*Le, supra,* 136 Cal.App.4th at pp. 935-936), in *Le* the trial court "relied on the formula provided by section 1202.4, subdivision (b)(2) . . . ." (*Id.* at p. 935.) We find no evidence of a similar reliance here.

*VIII. Pitchess Motion*

On December 9, 2008, appellant filed a *Pitchess* motion for inspection of material in the personnel files of Detectives Randol and Manion, the two detectives who interviewed appellant on February 2, 2007, for any material that would show misconduct amounting to moral turpitude.[15] At the hearing on the motion held on December 30, 2008, the court conducted an in camera review of the records of the San Jose Police Department related to Randol and Manion. The court found no discoverable material

---

[14] The probation officer's report simply recommends a restitution fine "of $10,000 be imposed under the formula permitted by Penal Code Section 1202.4(b)."

[15] Appellant sought "any and all sources relating to acts of falsifying police reports, writing misleading police reports, lying, dishonesty, conduct unbecoming an officer, obstruction of justice, failure to [adequately] investigate cases, bad faith investigation, attempts to influence witness testimony, attempts to improperly influencing the investigation of other officers, failure to document exculpatory evidence, coercive conduct, violation of constitutional rights, including but not limited to intentionally failing to provide advisement of *Miranda* rights to suspects, fabrication of charges, fabrication of reasonable suspicion and/or probable cause, false arrest, perjury, false or misleading internal reports including but not limited to false overtime or medical reports, or disability reports, and any other evidence of misconduct amounting to moral turpitude . . . ."

related to Randol, but did identify discoverable material related to Manion, which the court ordered turned over to the defense. The court ordered the transcript of the in camera proceeding sealed.

Appellant asks us to perform our obligation to review the record of the trial court's denial of his *Pitchess* motion, including the sealed reporter's transcript and the materials examined by the trial court to determine whether any undisclosed portion of Detective Randol's file was discoverable. Respondent has no objection.

In *Garcia v. Superior Court* (2007) 42 Cal.4th 63, the California Supreme Court explained: "In *Pitchess, supra,* 11 Cal .3d 531, 'we recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in [a] law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge. "In 1978, the California Legislature codified the privileges and procedures surrounding what had come to be known as '*Pitchess* motions' . . . through the enactment of . . . sections 832.7 and 832.8 and Evidence Code sections 1043 through 1045." [Citation.] By providing that the trial court should conduct an in camera review, the Legislature balanced the accused's need for disclosure of relevant information with the law enforcement officer's legitimate expectation of privacy in his or her personnel records.' (*People v. Mooc* (2001) 26 Cal.4th 1216, 1219–1220 (*Mooc*).)" (*Garcia v. Superior Court, supra,* 42 Cal.4th at pp. 69-70, fns.omitted.)

In *Warrick v. Superior Court* (2005) 35 Cal.4th 1011, our Supreme Court clarified that "The trial court may not disclose complaints more than five years old, the 'conclusions of any officer' who investigates a citizen complaint of police misconduct, or facts 'so remote as to make [their] disclosure of little or no practical benefit.' (§ 1045, subd. (b); [citation].) Typically, the trial court discloses only the names, addresses, and telephone numbers of individuals who have witnessed, or have previously filed complaints about, similar misconduct by the officer." (*Id*. at p. 1019.)

45

The *Mooc* court explained in detail how an in camera hearing should be conducted. "When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself. [Citation.] A law enforcement officer's personnel record will commonly contain many documents that would, in the normal case, be irrelevant to a *Pitchess* motion, including those describing marital status and identifying family members, employment applications, letters of recommendation, promotion records, and health records. [Citation.] Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in camera review. But if the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court. Such practice is consistent with the premise of Evidence Code sections 1043 and 1045 that the locus of decisionmaking is to be the trial court, not the prosecution or the custodian of records. The custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion. A court reporter should be present to document the custodian's statements, as well as any questions the trial court may wish to ask the custodian regarding the completeness of the record. [Citation.] [¶] The trial court should then make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review." (*Mooc, supra,* 26 Cal.4th at pp. 1228–1229.)

The *Mooc* court rejected a suggestion that the custodian of records must always produce the *entire* personnel file in response to a *Pitchess* motion, noting that the custodian's obligation is to produce only those documents from the file "that were

46

potentially responsive to [the] defendant's specific request." (*Mooc, supra,* 26 Cal.4th at p. 1230.)

A reviewing court "routinely independently examines the sealed records of such in camera hearings to determine whether the trial court abused its discretion in denying a defendant's motion for disclosure of police personnel records." (*People v. Prince, supra,* 40 Cal.4th at p. 1285.)

At the in camera hearing in this case, the Custodian of Records for the City of San Jose Police Department was placed under oath and described the records he had brought to the hearing, which consisted of the internal affairs file (I.A. file) for both detectives and their entire personnel files. Detective Randol had no citizen initiated complaints in his file. Detective Manion had two complaints. After reviewing the documentation in Detective Manion's I.A. file, the court found that one was not discoverable; the other was discoverable and as noted the court ordered that it be turned over to the defense.

As to the official personnel files, the custodian of records described how the files were set up. The files included a page showing who viewed the file. There was a section for performance appraisals, work permits, letters of commendation and reprimand and a miscellaneous section. The custodian of records highlighted anything in the files that he felt was relevant. The court examined both files and found that there was nothing discoverable in Detective Randol's file and that the court had already ordered discovery of the citizen complaint, which was also reflected in Detective Manion's personnel file; the court found nothing else that was discoverable with respect to Detective Manion.

Appellant notes that he filed a motion below to augment the appellate record with the documents the trial court reviewed during the in-chambers proceeding. Subsequently, the superior court clerk indicated she was unable to locate these documents. The absence of these documents, while unfortunate, is not problematic. Meaningful appellate review is still possible because the trial court sufficiently described the contents of the personnel file and the documents it reviewed. (See *People v. Prince, supra,* at pp. 1285–1286,

47

[concluding that although the trial court did not copy the personnel file, it adequately stated for the record the contents of that file sufficient to permit meaningful appellate review].)  Having reviewed the sealed transcript of the in-chambers proceeding, independently, we conclude that the trial court did not abuse its discretion in ruling upon appellant's *Pitchess* motion.

*Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.