[No. S161545. May 10, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
REGINALD WYATT, Defendant and Appellant.

COUNSEL

Waldemar D. Halka, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman, Laurence K. Sullivan, Violet M. Lee and Brent Wilner, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAXTER, J.—While in defendant's care, defendant's 14-month-old son died of shock and hemorrhage due to blunt force trauma to the chest and abdomen. A jury convicted defendant of involuntary manslaughter (Pen. Code, § 192, subd. (b))[1] and assault on a child causing death (§ 273ab). The Court of Appeal reversed the section 273ab conviction, finding the evidence insufficient to prove the requisite mens rea for the assault element of the offense.

We conclude the Court of Appeal misapplied the mens rea standard for assault as stated in *People v. Williams* (2001) 26 Cal.4th 779 [111 Cal.Rptr.2d

---

[1] All further statutory references are to this code unless otherwise indicated.

114, 29 P.3d 197] (*Williams*). Under *Williams*, a defendant may commit an assault without realizing he is harming the victim, but the prosecution must prove the defendant was aware of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from the defendant's conduct. Here, substantial evidence established that defendant knew he was striking his young son with his fist, forearm, knee, and elbow, and that he used an amount of force a reasonable person would realize was likely to result in great bodily injury. We therefore reverse the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with this opinion.

## Factual and Procedural Background

In May 2003, defendant, Reginald Wyatt, was living with his girlfriend, Tiffany Blake, and their infant daughter, Valerie. Defendant also had a 14-month-old son, Reginald Wyatt, Jr. (Reginald), from a previous relationship with Charrikka Harris. On the morning of May 18, 2003, Reginald stopped breathing while in defendant's care during a weekend visit. He was rushed to the hospital, but could not be revived. Although the treating doctor saw no signs of significant injury on the body, the autopsy disclosed that Reginald died of shock and hemorrhage due to blunt force trauma to the chest and abdomen.

Defendant admitted to police that he had hit Reginald multiple times in the chest, head, and back while play-wrestling with him. An information was filed charging defendant with one count of murder. (§ 187, subd. (a).) The information also charged him with one count of assault on a child causing death, an offense sometimes referred to as child abuse homicide. (§ 273ab.)

As we shall discuss at greater length below, the evidence at trial included medical and physical evidence concerning Reginald's injuries, defendant's tape-recorded statements and trial testimony, and testimony from Harris and Blake. After the defense rested, the court granted defendant's motion for judgment of acquittal as to the murder count. (§ 1118.1.) The jury found defendant guilty of the lesser included offense of involuntary manslaughter and of child abuse homicide. The court sentenced him to 25 years to life for child abuse homicide and stayed his sentence for involuntary manslaughter.

The Court of Appeal reversed the section 273ab conviction, but otherwise affirmed the judgment. The court concluded the evidence was insufficient to prove the requisite mens rea for child abuse homicide, because it failed to show defendant had "*actual* knowledge" he was "wrestling far too hard with his young son."

We granted review to determine whether substantial evidence supported the section 273ab conviction, and, specifically, whether reversal was required under *Williams, supra,* 26 Cal.4th 779.

## DISCUSSION

■ Section 273ab defines the offense of child abuse homicide.[2] The elements of the offense are: "(1) A person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death." (*People v. Malfavon* (2002) 102 Cal.App.4th 727, 735 [125 Cal.Rptr.2d 618]; see *People v. Stewart* (2000) 77 Cal.App.4th 785, 794 [91 Cal.Rptr.2d 888].) The manifest purpose of section 273ab is "to protect children at a young age who are particularly vulnerable." (*People v. Albritton* (1998) 67 Cal.App.4th 647, 660 [79 Cal.Rptr.2d 169] (*Albritton*).)

At issue here is the element of the offense that the defendant caretaker "commit *an assault* with force such that a reasonable person would know it was likely to inflict great bodily injury." (*People v. Malfavon, supra,* 102 Cal.App.4th at p. 743, italics added.) In particular, the parties dispute the showing required to establish the mens rea for assault and the sufficiency of the trial evidence on that point. As we shall explain, these disagreements are readily resolved by applying the analysis in *Williams, supra,* 26 Cal.4th 779, and the settled rules governing sufficiency of the evidence challenges.

■ Even before *Williams,* our cases consistently recognized that assault does not require a specific intent to injure the victim. As we explained, the criminal intent required for assault is "the general intent to wilfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another." (*People v. Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479 P.2d 372] (*Rocha*).) Put another way, "[t]he mens rea is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery. Although the defendant must intentionally engage in conduct that will likely produce injurious consequences, the prosecution need not prove a specific intent to inflict a particular harm." (*People v. Colantuono* (1994) 7 Cal.4th 206, 214 [26 Cal.Rptr.2d 908, 865 P.2d 704]; see *Rocha,* at p. 899 [the intent to cause any particular injury, to severely injure another, or to injure in the sense of inflicting bodily harm, is not necessary].)

---

[2] Section 273ab provides: "Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life. Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 or Section 189."

■   In addressing the mens rea for assault, *Williams* clarified: "Logically, a defendant cannot have [the required] intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. *He, however, need not be subjectively aware of the risk that a battery might occur.*" (*Williams, supra,* 26 Cal.4th at pp. 787–788, italics added, fn. omitted.) On this point, *Williams* emphasized: "[A] defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Id.* at p. 788, fn. 3.)

■   Consistent with *Williams,* a defendant may be guilty of an assault within the meaning of section 273ab if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act. (See *Williams, supra,* 26 Cal.4th at p. 788.) The defendant, however, need not know or be subjectively aware that his act is capable of causing great bodily injury. (*Albritton, supra,* 67 Cal.App.4th at pp. 658–659.) This means the requisite mens rea may be found even when the defendant honestly believes his act is not likely to result in such injury. (See *Williams,* at p. 788, fn. 3.)

To determine whether the evidence at trial was sufficient to support defendant's conviction for child abuse homicide, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*Ibid.*)

Here, the evidence presented to the jury included physical evidence and medical expert testimony concerning the victim's injuries, the testimony of Charrikka Harris (the victim's mother) and Tiffany Blake (defendant's girlfriend), two tape-recorded interviews of defendant, and defendant's own testimony. Such evidence established the following.

Defendant lived in an Oakland apartment with Blake and their infant daughter, Valerie. Defendant's 14-month-old son, Reginald, came for a weekend visit on May 17 to 18, 2003. On Sunday, May 18, Blake got up around 7:00 a.m. to get ready for work. She saw defendant playing with Reginald. He was lifting the boy up in the air over his head, spinning him around, and bouncing him down onto the bed. Reginald had a blank look on his face, and Blake warned defendant he was playing too rough and could hurt his son.

Blake left for work around 9:00 a.m., leaving defendant to care for Reginald and Valerie. Around 10:45 a.m., defendant asked his neighbor, Douglas Curtis, to call 911 because Reginald was not breathing despite defendant's efforts to administer CPR. When the paramedics arrived 10 minutes later, Reginald still was not breathing, and he had no pulse. Reginald was transported to a hospital, where he was pronounced dead.

The next day, May 19, an autopsy disclosed that Reginald died of injuries resulting from blunt force trauma. Defendant was at Harris's home when the coroner informed Harris of the autopsy result. Defendant went to the police department, accompanied by his brother, Oakland Police Officer Anthony Caldwell.

That evening, Oakland Police Sergeants Rullamas and Nolan conducted two tape-recorded interviews of defendant after reading him his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].[3] In the first recorded interview, defendant explained he got up on Sunday morning and started wrestling and playing with Reginald. Defendant picked Reginald up and threw him on the bed, and "chopped" his back with both hands. He held Reginald up and pressed the boy's stomach to his head, and then turned and flipped Reginald a distance of about four feet onto the bed. At one point, while Blake was still at home, defendant accidentally fell on top of Reginald while performing a move he called "comin' off the top rope." As defendant was about to jump on the bed, Reginald rolled unexpectedly and defendant's hip came down on Reginald's stomach, along with most or all of defendant's body weight of 170 pounds. Reginald grunted as if the wind had been knocked out of him, but he did not cry and continued to smile and seemed fine. When Blake later told defendant he was playing too rough with Reginald and could hurt him, defendant stopped.

After Blake left for work, defendant resumed wrestling with Reginald for another 20 or 30 minutes. During this period, defendant might have hit his

---

[3] Although an arrest warrant had been prepared based on the autopsy result, defendant was not arrested before the interviews.

son harder because Blake was not there to interfere. Defendant "body-slammed" Reginald about four times, and used his fists to hit Reginald in the chest about 10 or 11 times. He did an "atomic elbow" to Reginald's head, hit him in the upper chest with his forearm about three times, and then hit him on the back. In addition, defendant held Reginald up by his neck, squeezed him between his legs, and twice did a "knee drop," in which he hit Reginald in the back with his knee. He also did "pretend" head butts and boxed with Reginald, and repeatedly did a "suplex," which involved grabbing Reginald and flipping him over defendant's body onto the bed. Defendant said he wanted his son to be more "active" and was trying to "toughen him up" because a kid cannot be "soft" to grow up in Oakland.

After discussing defendant's first interview with members of the district attorney's office, Sergeants Rullamas and Nolan interviewed defendant a second time later that evening. When they asked what defendant was feeling when wrestling with Reginald, defendant said he was not feeling like himself or thinking about being rough, then clarified he was "stuck" on play-fighting with his son: "Like I just had a one-track mind. I was just stuck on toughening him up, playin' with Reggie, beatin' up Reggie . . . that's all that was stuck on there." He further stated, "[M]y mind musta went blank, though, for me to really . . . hit him hard enough . . . to hurt him, and I not notice it. I wasn't payin' attention, and I wasn't thinkin'." In defendant's words, "I was hittin' him pretty hard" and "I wasn't doin' nothin' to not hit him no harder." As for why he did not heed Blake's warning about hurting Reginald, defendant admitted he was "[h]ard-headed" and "[s]tubborn" and "[d]idn't want a woman to be tellin' me how to raise my son." Although he had play-wrestled with Reginald before, this was the first time he "lost control."

Dr. David Levin testified he performed an autopsy on the victim's body on May 19, 2003. Reginald was 31 inches tall and weighed 26 pounds. Dr. Levin's external examination disclosed an abrasion on Reginald's chin and two abrasions on the neck. There was a laceration of the frenulum of the upper lip[4] and a contusion on the chest. During his internal examination, Dr. Levin found an internal contusion of the scalp at the forehead, and bleeding on the surface of the heart, on the tissue behind the heart, and at the hilus of the left lung.[5] There were four lacerations to the liver, which caused internal bleeding of 200 milliliters of blood into the abdominal cavity. Dr. Levin also found hemorrhaging behind the abdominal cavity and in the

---

[4] The frenulum is the membranous tissue that connects the lip to the gum.

[5] The hilus is the area where the great vessels and the airways pass into and out of the lung.

mesentery of the small and large intestines,[6] as well as acute fractures of the fifth and sixth ribs on both the right and left sides of the back of the body. He additionally observed mild cerebral swelling.

Dr. Levin determined that Reginald died of shock and hemorrhage due to blunt force trauma to the chest and abdomen. The injuries were consistent with multiple instances of blunt force trauma to the back, abdomen, chest, and head, although some of the injuries could have been caused if a person who weighed 170 pounds jumped up and landed with his hip onto the child's midsection. The infliction of trauma would not necessarily result in external bruising, especially in softer areas like the abdomen. The contusion on the chest could have been caused by someone attempting to administer CPR, but it was highly unlikely CPR caused the fractured ribs in the back of the body.

Dr. James Crawford testified as a pediatric expert in the medical evaluation of child abuse. According to Dr. Crawford, Reginald's injuries were "at the end of the bell curve," meaning they were at a level uncommon for a one-year-old child. The types of injuries Reginald suffered, including the four lacerations to the liver and the multiple sites of internal bleeding, "are seen only in the most serious events," such as when children are in car crashes or hit by motor vehicles. The likelihood that Reginald's ribs were broken during CPR was "extraordinarily small." Although the fractures could conceivably have been caused by blunt force trauma to the child's back, it would have to have been "something that would have been quite violent, quite out of the ordinary," given how uncommon rib fractures are in children. Unless the child was unconscious or had a profound neurological condition, he would be expected to react to the types of injuries shown here by crying and clearly demonstrating distress. Dr. Crawford found it unbelievable that a child with such injuries would be laughing and smiling.

In Dr. Crawford's opinion, there had to have been "at least multiple, and potentially many impacts" for the identified injuries to have resulted. Although it was remotely possible that one extremely violent lateral compression could have caused all of the significant injuries, it was more likely the injuries were caused by more than one blow. If all the different injuries were caused by a single event, it would have to have been "an extraordinarily violent act."

■ Based on the foregoing evidence, a rational jury could find beyond a reasonable doubt that Reginald, who was 14 months old, died at the hands of defendant, a caretaker who intentionally used force that a reasonable person

---

[6] The mesentery is a sheet of tissue through which blood vessels course to and from the intestines.

would believe was likely to cause great bodily injury. (*Williams, supra,* 26 Cal.4th at p. 788; *Albritton, supra,* 67 Cal.App.4th at p. 658.) First, defendant's own statements furnished substantial evidence that he intentionally acted to strike Reginald (*People v. Colantuono, supra,* 7 Cal.4th at p. 214; *Rocha, supra,* 3 Cal.3d at p. 899); by his own account, defendant was fully aware he was striking his son a number of times with his fist, forearm, knee, and elbow. Second, the physical evidence amply showed that Reginald suffered extensive injuries, including internal bleeding at multiple sites, multiple lacerations to the liver, acute rib fractures, and cerebral swelling. Third, expert testimony established that Reginald's injuries were likely caused by multiple impacts or instances of blunt force trauma, that blunt force trauma does not necessarily result in external bruising, especially in softer areas like the abdomen, and that Reginald's injuries were similar to the types of injuries seen only in the most serious events, such as when children are hit by cars or are in car crashes. Consequently, even though Reginald's body lacked external signs of significant trauma, the nature and extensiveness of his internal injuries provided sufficient evidence that defendant used an amount of force a reasonable person would believe was likely to result in great bodily injury to a young child. (See *People v. Stewart, supra,* 77 Cal.App.4th at pp. 794–795; *Albritton, supra,* 67 Cal.App.4th at p. 656.) On this record, we have no trouble concluding that substantial evidence supports defendant's conviction of child abuse homicide.

The Court of Appeal acknowledged that *Williams*'s articulation of the mens rea standard was pertinent to the sufficiency-of-the-evidence inquiry: "[W]hat is in question here is whether there was substantial evidence that [defendant] 'was *aware of facts* that would lead a reasonable person to realize that [his] act by its nature would directly and probably result in great bodily injury to the child.' " (Italics added.) But in finding the evidence insufficient on this point, the court emphasized that there was no evidence showing defendant had *actual* knowledge he was wrestling far too hard with his son, and that "it never occurred to [defendant] that he was hurting Reginald." As for defendant's tape-recorded statements that he was not thinking or paying attention while play-wrestling with Reginald, the court interpreted them as merely demonstrating defendant's "attempt to understand how he could have struck his son hard enough to fatally injure him without knowing he was doing it."

This reasoning cannot be reconciled with the long-standing rule, reiterated in *Williams,* that "assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur." (*Williams, supra,* 26 Cal.4th at p. 790; see *Rocha, supra,* 3 Cal.3d at p. 899.) Thus, any failure on defendant's part to realize he was hurting and fatally injuring Reginald is of no consequence to the issue at hand.

We repeat: the assault element of a section 273ab offense requires an intentional act and actual knowledge of those facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from the act. (See *Williams, supra,* 26 Cal.4th at p. 790; *Albritton, supra,* 67 Cal.App.4th at p. 658.)[7] Here, the record contains substantial testimonial, medical, and other evidence that defendant intentionally struck his young son multiple times in a manner that would lead a reasonable person to realize great bodily injury would likely result.

## CONCLUSION AND DISPOSITION

Mindful of our duty to "review the entire record in the light most favorable to the judgment" and to "presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence" (*People v. Lindberg, supra,* 45 Cal.4th at p. 27), we conclude sufficient evidence supports the child abuse homicide conviction.

The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for further proceedings consistent with this opinion.

George, C. J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring.—I concur in the majority opinion under compulsion of this court's holding in *People v. Williams* (2001) 26 Cal.4th 779 [111 Cal.Rptr.2d 114, 29 P.3d 197] (*Williams*).

In *Williams,* a majority of this court defined the mental state of the crime of assault (Pen. Code, § 240) as requiring only that the defendant have "actual knowledge of the facts sufficient to establish that the defendant's act by its nature will probably and directly result in injury to another" (*Williams, supra,* 26 Cal.4th at p. 782), and as not requiring "a specific intent to cause injury or a subjective awareness of the risk that an injury might occur" (*id.* at p. 790). I disagreed, concluding that "assault requires proof of an intent to injure another." (*Id.* at p. 791 (dis. opn. of Kennard, J.); see also *People v.*

---

[7] Defendant contends the mens rea standard articulated in *Williams* is inconsistent with the Legislature's intent in codifying the common law of assault in section 240. Relying on section 240's definition of assault as "an *unlawful* attempt, coupled with a present ability, to commit a violent injury on the person of another" (italics added), defendant claims the offense must, as a matter of legislative intent, be understood to require the intent to inflict injury. We have, however, thoroughly considered the legislative history of section 240 and rejected the notion that assault requires such an intent. (*Williams, supra,* 26 Cal.4th at pp. 784–790; see also *People v. Chance* (2008) 44 Cal.4th 1164, 1169–1172 & fn. 6 [81 Cal.Rptr.3d 723, 189 P.3d 971].)

*Colantuono* (1994) 7 Cal.4th 206, 225–228 [26 Cal.Rptr.2d 908, 865 P.2d 704] (conc. & dis. opn. of Kennard, J.).)

Here, the majority applies the definition of the term "assault" that it announced in *Williams, supra,* 26 Cal.4th 779, to Penal Code section 273ab, which provides: "Any person who, having the care or custody of a child who is under eight years of age, *assaults* the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment . . . for 25 years to life." (Italics added.) Based on that definition, the majority here affirms defendant's conviction for violation of Penal Code section 273ab.

It is reasonable to infer that the Legislature intended that the term "assault," as used in Penal Code section 273ab, be defined synonymously with its definition in Penal Code section 240, which describes the crime of assault. Because the definition of the requisite mental state for the crime of assault that the majority announced in *Williams, supra,* 26 Cal.4th 779, now has the force of precedent, it applies here. Applying that definition to the facts of this case, I agree with the majority that substantial evidence supports defendant's conviction for violating Penal Code section 273ab, and I therefore join the majority in reversing the judgment of the Court of Appeal, which found insufficient evidence to support that conviction.