Filed 3/30/23  P. v. Norwood CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW NORWOOD,<br><br>Defendant and Appellant. | B322743<br><br>(Kern County<br>Super. Ct. No.<br>MF013183A) |

APPEAL from a judgment of the Superior Court of Kern County, Charles R. Brehmer, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Louis M. Vasquez, Supervising Deputy Attorney General, and Lewis A. Martinez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

Abel Norwood (Abel), defendant and appellant Matthew Norwood's (defendant's) two-month-old son, died of blunt force head trauma. A jury found defendant inflicted the fatal injuries and convicted him of second degree murder and assault on a child resulting in death. The trial court sentenced defendant to 25 years to life in prison. We consider defendant's various challenges to the judgment: (1) whether the assault on a child statute, section 273ab of the Penal Code,[1] is unconstitutional because it imposes a penalty for an assault equal to the sentence for first degree murder, (2) whether the trial court's modification to the pattern instruction for second degree murder that addressed the duty of parents to protect their children led the jury to misapply the instruction, (3) whether the trial court erred by admitting evidence about defendant's eyelid tattoos, and (4) whether the court erred by imposing various fines and assessments without first determining defendant's ability to pay.

## I. BACKGROUND

### A. Abel's Hospitalization and Death

On October 17, 2018, defendant, Abel, and Abel's mother Brittney Collins (Collins) were living in the home of Collins's 78-year-old grandmother Shirley Collins (Shirley). Early that morning, defendant and Collins argued about his drug abuse; Collins told him to move out of the family home and defendant broke Collins's mobile phone. In the hours after the argument, defendant was Abel's primary caregiver because Collins was not feeling well; she was still recovering from the effects of her

---

[1] Undesignated statutory references that follow are to the Penal Code.

caesarian section weeks earlier and she was at the time suffering from an infection and the side effects of an antibiotic.

At approximately 4:00 p.m., defendant left the family home to go to Home Depot. According to defendant, Abel was "fine" when he left the house. Less than an hour after leaving the family home, defendant received a telephone call from Collins saying something was wrong with Abel. When defendant arrived home, Shirley and Collins were crying and two neighbors, who found Abel to be "burning up" and "lifeless" with his eyes rolling up into the back of his head, were trying to lower Abel's temperature by putting cool water on him. One of the neighbors had called 911.

The responding paramedics and firefighters found Abel pale, lethargic, and unresponsive to stimulus. After concluding Abel "needed help immediately," the paramedics rushed him to Kern Medical Center, in Bakersfield, California. During the drive to the hospital, Abel exhibited "seizure-like activity" and remained unconscious.

At the medical center, one of the emergency room nurses observed bruising and swelling below Abel's left knee indicative of a possible bone fracture. Defendant told the nurse the bruising was largely self-inflicted because Abel would move around as he slept in his bassinet which had a plywood-like base. The nurse ordered an x-ray of Abel's leg, in addition to a computerized tomography (CT) scan of his head. The x-ray of Abel's left leg showed a recent fracture of the left tibia; the fracture was also angulated, i.e., the tibia was not merely broken but also bent out of its normal axis. The CT scan revealed multiple bilateral parietal skull fractures and small scalp hematomas; the head injuries were so "profound" that in the radiologist's opinion Abel's

brain was at the time either "already dead or in the process of dying."

After consulting with the radiologist, the emergency room nurse contacted Kern County's child protective services agency. Later that night, because the medical center did not have a pediatric intensive care unit, Abel was airlifted by helicopter to Valley Children's Hospital (Valley Children's) in Madera, California.

The following day, a pediatric radiologist at Valley Children's reviewed various diagnostic imaging studies of Abel. The CT scan of the pelvis and abdomen and a bone survey showed multiple rib fractures, some of which were quite recent, while others were older. The x-rays of Abel's head from the bone survey showed displaced skull fractures, an occurrence which is uncommon in infants as it requires major trauma, such as a high-speed automobile accident. In each of Abel's four extremities, the radiologist found evidence of metaphyseal corner fractures, "a very uncommon fracture type," one which is "only seen in child abuse."[2] In the radiologist's opinion, the imaging studies taken together were diagnostic of "severe" or "pure" child abuse, "unless the child had been in a car accident at 75 miles per hour [and] ejected" from the vehicle. Due to the different ages of his injuries, Abel would have had to suffer multiple incidents of trauma to account for all the injuries.

---

[2]     In addition, a pediatric ophthalmologist at Valley Children's examined Abel's eyes. Using RetCam, a high resolution digital imaging system, the ophthalmologist found retinal hemorrhages "too many to count" where "there should not by any." The number of hemorrhages were, in the view of the ophthalmologist, indicative of trauma.

4

A week after being hospitalized, Abel died. An autopsy was subsequently performed by a forensic pathologist.

The autopsy revealed that almost all of the rib fractures displayed callus formations, which meant the injuries occurred seven to 10 days before Abel was hospitalized and were the result of "extreme" or "severe" chest compressions: "the child's chest and torso [we]re grasped between . . . two hands and then the infant's body [was] markedly[,] violently shaken . . . ." In contrast to the rib fractures, the leg fracture was "fresh," with no signs of healing. The autopsy also revealed that, in addition to retinal hemorrhages, Abel suffered retinal detachments, a finding which came as a "surprise" to the pathologist because such injuries are usually found in infants who suffered violent head trauma as a result of traffic accidents.

In the pathologist's opinion, the cause of Abel's death was "blunt head injuries" and "the manner of death was homicide." The pathologist opined Abel's head and leg injuries occurred at the same time; "the leg was used as a handle to pick the infant up and then sw[u]ng . . . into a wall or down into the ground . . . causing death." There was no possibility of recovery from such a head injury; Abel was "dying from the time of the injury."

### B.     Defendant's Statements to Law Enforcement

Because there was no room for them in the helicopter that transported Abel from Kern Medical Center to Valley Children's, defendant, Collins, and Shirley drove to Madera. After they arrived at Valley Children's, a Madera County Sheriff's deputy, acting in response to a request from the Kern County Sherriff's

5

Office for assistance in a possible child abuse investigation, questioned Abel's parents.

Defendant said that before he left the family home, he changed Abel's diaper and attempted to feed him. According to defendant, Abel was "fussy" as usual during the changing but went back to sleep before defendant could feed him. Defendant then went to Home Depot. Collins told the deputy that after defendant left to go to Home Depot, she heard Abel make a noise; when she went to check on him, she found him pale in color and warm to the touch. Both parents denied Abel had been struck or dropped. Both parents also stated Shirley would occasionally watch Abel for short periods, anywhere from 30 minutes to two hours but, as Collins explained, due to Shirley's limited mobility (she used a walker) she would not carry the baby.

When defendant and Collins arrived back home the following day (October 18), they found deputies from the Kern County Sheriff's Office conducting a search. In one of the home's bathrooms, deputies found a hypodermic needle with a "blackish substance" inside of it. In the bedroom used by defendant and Collins, deputies found an open suitcase laying on the bed half-filled with what may have been men's clothes.

Following the search, defendant and Collins agreed to be interviewed at the Sheriff's Tehachapi substation. While waiting for the interviews to begin, defendant and Norwood remained in the backseat of a patrol car. The car was equipped with an audio recording device and their conversation was recorded. As soon as they were left alone in the patrol car, defendant told Collins, "Don't be tryin' to add anything extra to your story, okay"? During their conversation, which they recognized could be subject to recording, defendant repeatedly told Collins he loved her and

6

stated he would not incriminate Collins or anyone else. Collins replied, "Babe, I'm not going to throw you under the bus." Defendant and Collins also repeatedly made statements suggesting Shirley may have been responsible for Abel's injuries. Collins also told defendant she saw the law enforcement officers recover the aforementioned hypodermic needle.

Upon arriving at the stationhouse, detectives interviewed defendant and Collins separately. During defendant's interview, he recounted the events on the day of Abel's hospitalization in a manner that was consistent with the account he gave to the deputy at Valley Children's, adding only that Abel was a "very grumpy baby," had been "grumpy since day one," and on that particular day was "extra grumpy." In addition, defendant said a bruise on Abel's left knee predated his hospitalization and was brought to the pediatrician's attention twice at recent well-baby visits. Defendant said the pediatrician had ruled out the bassinet as a cause of the bruising but advised that Abel's leg was "fine."

When asked whether he thought Shirley caused Abel's injuries, defendant replied, "I do, 100% I do. . . . [¶] . . . [¶] Because I've caught her many times walking around with [Abel] and again, she can't even get in the car 'cause she's not able to walk with[out] a cane. I mean, you saw her walk today. You know? A lot of trouble walking even with a cane by herself and we have to help her walk with a cane, let alone carrying a child and I mean, these injuries are kind of in line with an infant being dropped. I mean, he falls hits his leg, cracks his leg and then what's next is his head." Even after the detectives walked defendant through Abel's injuries and their severity, which indicated his hospitalization was not due to "a simple fall to the ground," defendant persisted in blaming Shirley: "Again, I think

7

it was [Shirley]. . . . [S]he's a spiteful person, very spiteful. [¶] . . . [¶] [Shirley] has been caught doing things she wasn't supposed to be doing already. And she was specifically told by my wife's aunt don't pick him up and don't carry him and walk with him and she['s] still doing it . . . . [¶] . . . [¶] . . . [Shirley] has been caught by both of us multiple times carrying [Abel]."

Defendant admitted using methamphetamine since he was 16 years old but he denied that the hypodermic needle found in the family home belonged to him; he claimed his preferred method of ingestion was inhaling, not injection. After detectives noted needle track marks on his arms, defendant said they were old marks. Defendant also described himself as a "functioning tweeker," but claimed he quit a week before Abel's hospitalization. The results from defendant's urine sample taken on the day of his interview were positive for methamphetamine and indicated ingestion incurred anywhere from one to seven days before the sample was taken.

C.     *Defendant's Arrest and the Evidence at Trial, Including Testimony by Defendant and Collins*

While Abel was still being cared for at Valley Children's, defendant and Collins were arrested and charged with causing their son's injuries. After Abel died, defendant and Collins were charged by information with murder (count one) and assault on a child under eight years old by means of force reasonably likely to produce great bodily injury, which results in the child's death (§ 273ab, subd. (a)) (count two). The charges against each defendant were tried to separate juries.

At trial, Shirley testified she carried Abel only once shortly after he was born and never changed any of his diapers. She

8

testified further that she attended the well-baby visit on October 16, defendant did not attend, and she did not observe any bruises on Abel.[3] On the following day, the day of Abel's hospitalization, she woke to find defendant and Collins arguing. Throughout much of October 17, Shirley did not see Abel and was given reasons by defendant, who was caring for him, not to see the baby (e.g., Abel had either just been fed and was falling asleep or was asleep). Shirley recounted for the jury how Collins, who looked "sad," told her she had earlier that day asked defendant to move out of the family home. Shirley stated defendant was in a "bad mood" that day and appeared "angry" when he left the house that afternoon—so angry he "kind of scared" her.

Timothy Frieson (Frieson), a good friend of defendant's who spent time with him "pretty much every day," testified that in 2018 defendant on more than one occasion "slammed" methamphetamine, i.e., injected the drug into his body with a needle. Frieson also testified further that on the day of Abel's hospitalization, he and defendant went to Home Depot together and attempted to purchase methamphetamine from some of Frieson's friends. Frieson opined, however, that defendant was an appropriate parent and Frieson said he never saw defendant use methamphetamine around Abel.

Collins testified defendant used methamphetamine on the day Abel was hospitalized, and, she believed, on the two previous

---

[3]     The nurse practitioner who examined Abel during his two most recent well-baby visits similarly testified defendant did not attend either visit. She also testified she did not observe or record any bruising anywhere on Abel or discuss bruising with Collins.

9

days as well.  According to Collins, defendant "slammed dope all the time."  When defendant ingested methamphetamine, he became "mean" and "angry."[4]

Collins also testified defendant abused her while pregnant with Abel: among other things, he choked her "a couple of times," he pushed her down when she was seven or eight months pregnant and hit her stomach, and when she was eight or nine months pregnant he pushed her during an argument and told her "he would make sure Abel wasn't born."[5]  Collins disavowed, however, her out-of-court admissions to detectives about defendant's earlier abuse of Abel, claiming she never saw defendant mistreat his son prior to October 17 and just told the detectives what she thought they wanted to hear.[6]  On October 17, the day Abel suffered his fatal injury, Collins testified she

---

[4]     A forensic toxicologist testified one of the side effects of methamphetamine is "aggressive violent behaviors."

[5]     A neighbor testified that prior to Abel's birth he witnessed defendant make a jabbing motion with a screwdriver toward a pregnant Collins's midsection while stating he did not want to be a father, which caused Collins to flee toward the family home vowing to keep the baby.

[6]     Collins agreed she told the detectives she had seen defendant mistreat her son prior to his hospitalization by putting a hand over Abel's mouth to quiet him, squeezing him too hard, shaking his head, bumping his head, and patting his head too hard.  Collins told detectives that on five or six occasions prior to October 17, when defendant was caring for Abel in another room, she heard loud bangs followed by the sound of Abel crying; when she would ask defendant what happened, his explanations for the noises and crying would not "add up."

10

heard a loud bang from the room where defendant was caring for Abel before he left for Home Depot, but no resulting cry from Abel.

Collins admitted that when she talked to the detectives on October 18 she lied on a number of occasions. Among other things, she falsely claimed, at defendant's direction, that the hypodermic needle recovered from the family home was hers; she did so in order to protect defendant. She also testified that she falsely claimed Shirley dropped Abel and did so at defendant's direction in order to protect him. According to Collins, Shirley "never" dropped Abel. Collins maintained, however, that she never saw any visible injuries or trauma on Abel's body prior to his hospitalization.

Defendant testified in his own defense. He said Collins's pregnancy with Abel was planned and he took various steps to prepare for Abel's arrival, such as attending Collins's prenatal medical appointments, painting Abel's room, child-proofing the family home, and buying toys, clothes, and baby furniture.

Defendant conceded he struggled with controlling his anger, and he admitted that at the time of Abel's hospitalization he was on probation for misdemeanor domestic violence and enrolled in a court-ordered domestic violence program. Defendant also admitted he was addicted to methamphetamine. But defendant continued to deny the hypodermic needle found in the family home was his. He also denied he tried to buy drugs with his friend Frieson on October 17. Defendant claimed he would never use methamphetamine directly around Abel; he would go into another room to ingest the drug and then return to care for his son.

11

Defendant acknowledged methamphetamine made him irritable and made it more difficult to control his anger, and he admitted his son's grumpiness irritated him but testified he was "never angry with his son no matter what." Although Abel was "more fussy than normal" and "screaming" on October 17, defendant was not irritated with him because he recognized his son had cause to be fussy because he received immunization shots the day before.

Defendant continued to insist it was possible Shirley inflicted some of Abel's injuries, but defendant conceded other injuries, such as the broken left leg and the retinal detachments, could only have been inflicted by himself or Collins. Defendant denied ever physically abusing Collins. He also denied killing Abel and specifically denied picking his son up and slamming his head into the ground or a wall, or swinging him by his leg into the ground.

Over defense counsel's relevancy objection and repeated objection that the subject was beyond the scope of the direct examination, defendant testified he had tattoos on his eye lids that spelled "fuck you." Defendant explained he got the tattoos shortly after Abel's death when he was in a "very dark place."

D. *Jury Instructions, Closing Argument, Verdict, and Sentencing*

Although the trial court understood the prosecution was proceeding against defendant on the theory he beat Abel to death, not that he failed in his duty to care for Abel by leaving him in the care of Collins, the court, for reasons not revealed by the record, instructed the jury on count one with a modified version of CALCRIM No. 520, the pattern instruction for murder. The

12

modified instruction deleted language about the failure to perform a duty which results in death and added the following language: "If you conclude that the defendant owed a duty to Abel N., and the defendant failed to perform that duty, his failure to act is the same as doing a negligent or injurious act." The defense did not object to the modified version of CALCRIM No. 520.

On the assault on a child resulting in death charge, the trial court instructed the jury with CALCRIM No. 820. To find defendant guilty under the instruction, the jury was required to find defendant acted "willfully" and "was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in great bodily injury to the child" and his act "caused" Abel's death. The defense raised no objection to this instruction either.

During closing argument, the prosecution did not argue defendant failed to care for Abel; rather, it argued he was guilty of implied malice murder for essentially clubbing his son to death. The prosecution mentioned defendant's eyelid tattoos once during closing, remarking the tattoos were indicative of how defendant treated other people. During the defense closing, counsel reiterated the prosecution was proceeding with a theory that defendant beat his son to death, not that he failed to care for him.

The jury found defendant guilty as charged.[7] The trial court sentenced defendant to 25 years to life for the assault on a

---

[7] Collins's jury found her guilty of second degree murder and guilty of the lesser included offense of assault with force likely to cause great bodily injury. The trial court sentenced Collins to 15 years to life in prison.

child conviction and 15 years to life for murder, with that sentence stayed pursuant to section 654. Without objection, the court also imposed various fines and assessments.

## II. DISCUSSION

Defendant contends his assault on a child resulting in death conviction should be reversed because the statue of conviction, section 273ab, is an unconstitutional strict liability statute in which a murder-like sentence is imposed for an offense without a mental state element. In the alternative, he argues the merger doctrine, which bars conviction of felony-murder based upon a death occurring as a result of a felonious assault, should preclude a first degree murder penalty for a death from an assault. Neither point is persuasive. Section 273ab is not a strict liability statute; rather, as our Supreme Court and prior Court of Appeal decisions have recognized, it is an assault statute with different elements than murder (and, in any event, the Legislature has the power and the prerogative to impose the same penalty for different offenses). The merger doctrine is inapplicable because defendant's murder conviction was based on malice, not a theory of felony murder, and his section 273ab conviction was not based on his murder conviction.

Defendant's remaining contentions are also unavailing. He argues CALCRIM No. 820 should, but does not, include a requirement that a defendant know (or a reasonable person would know) his or her act would result in death, but this argument fails because CALCRIM No. 820 accurately reflects the elements of child abuse homicide as defined by section 273ab and

14

governing case law.[8]  The modified CALCRIM No. 520 instruction given to the jury does not warrant reversal because, when considered in light of the other instructions given to the jury, the parties' closing arguments, and the evidence presented at trial, there is no reasonable probability the jury misapplied the instruction.  Defendant forfeited his claim that testimony about his eyelid tattoo was improper character evidence by failing to object on that ground at trial and, regardless, defendant was not prejudiced by the evidence.  Finally, defendant's challenge to the financial components of his sentence under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 is forfeited for lack of a contemporaneous objection.

> A.    *Section 273ab Is Not Unconstitutional and Defendant's Section 273ab Conviction Does Not Violate the Merger Doctrine*

Section 273ab, subdivision (a) defines an offense sometimes referred to in shorthand as "child abuse homicide."  (*People v. Wyatt* (2010) 48 Cal.4th 776, 779 (*Wyatt*).)  In relevant part, the statute provides for punishment of "[a]ny person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be

---

[8]    The Attorney General contends defendant forfeited this argument by failing to object to the jury instruction at trial.  A claim of instructional error that affects a defendant's substantial rights, however, can be made whether or not trial counsel objected.  (§ 1259; *People v. Burton* (2018) 29 Cal.App.5th 917, 923.)  The same holds true for the CALCRIM No. 520 instruction that was not objected to by the defense.  We opt to address both instructional error claims on the merits.

likely to produce great bodily injury, resulting in the child's death." (§ 273ab, subd. (a); see also Wyatt, *supra*, at 780 [the elements of the offense are "'(1) [a] person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death.' [Citations.]"].)  Although the elements of child abuse homicide are different from murder and section 273ab expressly disclaims any effect on California's murder statutes (§ 273ab, subd. (a) ["Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 or Section 189"]), section 273ab imposes the same penalty as for first degree murder: 25 years to life.[9]

Because the offense codified in section 273ab is a form of assault, it "does not require a specific intent to injure the victim." (*Wyatt*, *supra*, 48 Cal.4th at 780.)  "[T]he criminal intent required for assault is 'the general intent to willfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another.' [Citation.]" (*Ibid*.)  Consequently, "a defendant may be guilty of an assault within the meaning of section 273ab if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act. [Citation.]  The defendant, however, need not know or be

---

[9]     The Legislature increased the punishment for child abuse homicide from 15 years to life to 25 years to life in 1996. (Stats. 1996, ch. 460, § 2.)  The punishment for first degree murder without any special circumstance has been 25 years to life since 1978. (*In re Jeanice D.* (1980) 28 Cal.3d 210, 215, 218 & fn.6.)

16

subjectively aware that his act is capable of causing great bodily injury. [Citation.]  This means the requisite mens rea may be found even when the defendant honestly believes his act is not likely to result in such injury. [Citation.]" (*Id*. at 781; see also *People v. Albritton* (1998) 67 Cal.App.4th 647, 658 (*Albritton*) ["The mens rea for the crime is willfully assaulting a child under eight years of age with force that objectively is likely to result in great bodily injury—that is, the assault must be intentional"].)

### 1.	*Section 273ab is constitutional*

Over the years, a number of courts have considered and rejected defendant's argument that section 273ab infringes on constitutional due process rights because it imposes a murder-like punishment for an assault.  For example, in *People v. Norman* (2003) 109 Cal.App.4th 221, a jury found the defendant guilty of second degree murder under section 187 and child abuse homicide under section 273ab. (*Id*. at 224.)  On appeal, Norman argued his section 273ab conviction must be reversed because the statute imposed the same penalty as for first degree murder. (*Ibid*.)

The Court of Appeal affirmed the conviction, rejecting Norman's claim that section 273ab was unconstitutional. (*Id*. at 229.)  Based on the plain language of the statutes defining both offenses, the *Norman* court concluded section 273ab "is not a murder statute"; it establishes a different crime, with different elements. (*Id*. at 227, 229.)  Unlike murder, which requires proof of an unlawful killing and a showing of malice aforethought, the child abuse homicide statute requires proof of three other elements that are not required for murder: (1) an assault on a child under the age of eight, (2) by a person having care or

17

custody of the child, (3) with force that a reasonable person would know was likely to inflict great bodily injury.  (*Id*. at 228-229.)  The *Norman* court found "it immaterial that the punishment for a violation of section 273ab is the same as first degree murder," explaining that "[t]he Legislature exercised its prerogative in selecting the range of punishment, and there is no principle of law that precludes the same punishment for different crimes."  (*Id*. at 228.)  Other courts have similarly rejected constitutional challenges to the statute.  (See, e.g., *People v. Malfavon* (2002) 102 Cal.App.4th 727, 738-741 [because child abuse homicide and murder are separate crimes, there was no constitutional reason why the Legislature could not define a new homicide crime without the element of malice and set a 25-year-to-life penalty for such crime] (*Malfavon*); *People v. Basuta* (2001) 94 Cal.App.4th 370, 399 [element of care and custody creates a "meaningful distinction" between child abuse homicide and murder]; *Albritton*, *supra*, 67 Cal.App.4th at 659-660.)

Defendant, however, argues section 273ab has remained "static" despite changes in the law governing murder and felony murder and, in view of those changes, we should now hold the statute unconstitutional.  Specifically, defendant contends recent decisions by our Supreme Court in *People v. Chun* (2009) 45 Cal.4th 1172 (*Chun*) and *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), plus passage of Senate Bill No. 1437, provide reason to depart from prior precedent rejecting constitutional challenges.  In our view, defendant is mistaken, both about the relevance of recent changes in murder law to section 273ab and, more broadly, about which branch of government is responsible for defining crimes and their punishment.

18

The central concern in *Chun* was the constitutional validity of the common law second degree felony murder rule. Our Supreme Court held an assaultive felony cannot serve as the underlying felony for a second degree felony murder conviction. (*Chun*, *supra*, 45 Cal.4th at 1180, 1200.) In the later *Chiu* case, our Supreme Court was focused on aider and abettor liability for murder and held the natural and probable consequences doctrine cannot support a first degree premeditated murder conviction because "reasonable concepts of culpability" are inconsistent with first degree murder liability for someone who is not the actual killer or did not harbor an intent to kill. (*Chiu*, *supra*, 59 Cal.4th at 161, 165-166.)

Neither *Chun* nor *Chiu* addresses section 273ab or the Legislature's power to impose the same punishment for different crimes. The same holds true for Senate Bill 1437, which was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

In our view, these legal developments have no material bearing on the well-established rule that applies: "'The matter of defining crimes and punishment is solely a legislative function.' [Citation.] 'The Legislature also has the authority to change the penalties, or separate them by degree.' [Citation.] 'Prescribing punishment for various forms of homicide is distinctly within the police power of the states, as is the definition of the elements of crimes and the delineation of their punishments.' [Citation.]

19

'Evils in the same field may be of different dimensions and proportions, requiring different remedies.  Or so the legislature may think.' [Citations.]  ""[S]ubject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch.' [Citations.]"  [Citation.]' [Citations.]" (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1385.)  Ordinarily, so long as the Legislature acts rationally, the punishment imposed for a particular form of homicide will not offend due process.  (*Id.* at 1386; see also *People v. Wilkinson* (2004) 33 Cal.4th 821, 838, 840; *Malfavon, supra,* 102 Cal.App.4th at 739 [""Where . . . there are plausible reasons for [the Legislature's] action, our inquiry is at an end""].)

Here, the Legislature acted rationally in enacting section 273ab.  There is a rational basis to set the penalty for child abuse homicide as the Legislature did in order to deter a particularly egregious type of homicide in which the victims are young, defenseless children who are forcefully abused by those who have custody of them and are entrusted to protect them.  (*Albritton, supra,* 67 Cal.App.4th at 659-660 ["Considering the purpose of the statute—to protect children at a young age who are particularly vulnerable—there can be no dispute of the gravity of the governmental interest involved.  As our Supreme Court put it, it is 'an interest of unparalleled significance: the protection of the very lives of California's children, upon whose "healthy, well-rounded growth . . . into full maturity as citizens" our "democratic society rests, for its continuance""]; see also *People v. Lewis* (2004) 120 Cal.App.4th 837, [term of 25 years to life was not cruel and unusual punishment for defendant convicted of violating § 273ab; although defendant was a relatively young man without

20

a criminal record, the amount of force required to cause a four-month-old child's fatal head injuries and the amount of anger and loss of control that led to the assault, the punishment was not disproportionate to defendant's culpability].)

### 2. The merger doctrine does not bar defendant's section 273ab conviction

Section 273ab is not a felony murder statute and the merger doctrine only controls cases in which the felony murder rule applies. (*Chun, supra,* 45 Cal.4th at 1188-1189 [describing the merger doctrine as a restriction on the second degree felony murder rule].) Here, defendant's second degree murder conviction was based on malice instructions, not on a felony murder theory. Moreover, defendant's child abuse homicide conviction was separate from, and not dependent on, his murder conviction. Accordingly, the merger doctrine is inapplicable. (*Norman, supra,* 109 Cal.App.4th at 227 ["because section 273ab is not a murder statute, the so-called merger rule has no application to this case]; *Malfavon, supra,* 102 Cal.App.4th at 743-744 [neither murder nor child abuse homicide is a necessarily included offense within the other].)

### B. The CALCRIM No. 820 Instruction Was Not Error

CALCRIM No. 820 provides as follows: "To prove that the defendant is guilty . . . , the People must prove that: [¶] 1. The defendant had care or custody of a child who was under the age of 8; [¶] 2. The defendant did an act that by its nature would directly and probably result in the application of force to the child; [¶] 3. The defendant did that act willfully; [¶] 4. The force used was likely to produce great bodily injury; [¶] 5. When the

21

defendant acted, (he/she) was aware of facts that would lead a reasonable person to realize that (his/her) act by its nature would directly and probably result in great bodily injury to the child; [¶] 6. When the defendant acted, (he/she) had the present ability to apply force likely to produce great bodily injury to the child; [AND] [¶] 7. The defendant's act caused the child's death."

CALCRIM No. 820 correctly states the elements of section 273ab as defined by the language of the statute and construed by our Supreme Court in *Wyatt*, *supra*, 48 Cal.4th at page 780. There is no requirement, as defendant would have it, that there must be proof that someone charged with a section 273ab offense know (or a reasonable person would know) his or her act would result in death. There was accordingly no error in instructing the jury with CALCRIM No. 820.[10]

C.    *The Modified CALCRIM No. 520 Murder Instruction Does Not Warrant Reversal of Defendant's Murder Conviction*

In reviewing a claim of instructional error, the "challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) Here, the trial court instructed the jury using CALCRIM

---

[10]    Insofar as defendant also contends an instruction given to the jury that classified crimes as requiring general or specific intent contributed to instructional error, we do not believe the jury would have been led to misapply the more specific CALCRIM No. 820 by that general instruction.

No. 520, an instruction whose language our Supreme Court has repeatedly approved. (See, e.g., *People v. Knoller* (2007) 41 Cal.4th 139, 151-152; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104.)

CALCRIM No. 520 requires the prosecution to prove the following: "[1A. The defendant committed an act that caused the death of (another person/ [or] a fetus);] [¶] [OR] [¶] [1B. The defendant had a legal duty to (help/care for/rescue/warn/maintain the property of . . . [the decedent or other person to whom duty is owed] and the defendant failed to perform that duty and that failure caused the death of (another person / [or] a fetus);] [¶] [AND] [¶] 2. When the defendant (acted / [or] failed to act), (he/she) had a state of mind called malice aforethought." As later cases have recognized (see, e.g., *People v. Latham* (2012) 203 Cal.App.4th 319, 327), element 1B of CALCRIM No. 520 is consistent with the leading case of *People v. Burden* (1977) 72 Cal.App.3d 603 (*Burden*).

In *Burden*, defendant's five-month-old child died of malnutrition and dehydration. (*Burden, supra,* 72 Cal.App.3d at 607-608.) Burden admitted knowing that his wife (who was developmentally disabled) was not feeding the child adequately; he also admitted that he did not feed the child. (*Id.* at 609-610.) The jury was instructed "'that the word "act" as used in these instructions includes an omission or failure to act in those situations where a person is under a legal duty to act,' and that 'the parent of a minor child has a duty to furnish necessary clothing, food, shelter and medical attention for his minor child.'" (*Id.* at 614.) The jury found Burden guilty of second degree murder (*id.* at 606) and the Court of Appeal affirmed, holding the "instructions correctly stated the law. The omission of a duty is

23

in law the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical." (*Id*. at 616.)

The Bench Notes to CALCRIM No. 520, however, advise that element 1B should be given only "[i]f the prosecution's theory of the case is that the defendant committed murder based on his or her failure to perform a legal duty." Although the trial court knew the prosecution was not proceeding on a failure to care theory and deleted part 1B of the pattern instruction, the court retained, with modification for the facts of this case, an optional sentence in the pattern instruction about legal duties to another ("A parent has a legal duty to care for a child") and added the following: "If you conclude that the defendant owed a duty to Abel N., and the defendant failed to perform that duty, his failure to act is the same as doing a negligent or injurious act."

The trial court's modification to CALCRIM No. 520 was unnecessary and could in theory cause confusion. But we are confident on the record here that the jury did not apply the instruction in an impermissible manner. The unmodified portion of CALCRIM No. 520 discussed the concept of malice aforethought and how a finding of implied malice requires defendant intentionally commit an act which is dangerous to human life and how an act causes death if death is the natural and probable consequence of defendant's act. During their closing arguments, both parties expressly recognized the prosecution was proceeding on a theory defendant beat his son to death, not that he failed to care for him. The conviction under section 273ab required the jury to find defendant "willfully" performed an act the force of which was "likely to produce great bodily injury" and "caused the child's death." The medical

24

evidence showed Abel was swung by his left leg with sufficient force to break and misalign the tibia, as well as cause displaced skull fractures, retinal detachments, and retinal hemorrhages too numerous to count. Defendant admitted on the witness stand he had the physical strength to inflict the fatal injuries suffered by Abel; had problems controlling his anger; was addicted to a drug whose effects could lead to violent, aggressive behavior; and found Abel to be "extra grumpy" on the day he was transported to the hospital. In addition, the jury convicted defendant on the child abuse homicide offense in count two without instructions on aiding and abetting, which indicates the jury believed defendant was the perpetrator of the abuse. In view of all of the following, there is no reasonable probability the jury was misled by the instruction into relying on a failure to care theory of murder rather than the implied malice theory of physical abuse the parties argued.

> D. *Defendant Forfeited His Improper Character Evidence Claim and His Related Ineffective Assistance of Counsel Claim Fails*

As defendant concedes, there was no contemporaneous objection to the eyelid tattoo evidence on the ground now asserted: that it was improper character evidence. The claim raised on appeal is therefore forfeited. (*People v. Valdez* (2012) 55 Cal.4th 82, 130 ["Here, in objecting to the gang-related evidence, defense counsel neither mentioned Evidence Code section 1101 nor asserted that the evidence constituted inadmissible character evidence. Defense counsel did make various other objections to some of the evidence in question, including that it was irrelevant, cumulative, lacking in

foundation, or prejudicial.  However, these objections were insufficient to preserve for appeal the claim that the evidence was inadmissible under Evidence Code section 1101, subdivision (a)"]; *People v. Partida* (2005) 37 Cal.4th 428, 431 ["defendant may not argue on appeal that the court should have excluded the evidence for a reason *not* asserted at trial"].)

Understanding the grounds to find forfeiture, defendant briefly argues the absence of an objection on the ground now urged means he was denied effective assistance of counsel because there was no tactical reason for not making "the proper objection."[11]  We reject the ineffective assistance of counsel claim for lack of prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed"].)

There is no reasonable probability of a different result had defendant's trial counsel objected to the tattoo evidence as improper character evidence.  The discussion of defendant's tattoos during cross-examination was brief and, contrary to defendant's assertion, the prosecution did not "hammer" on this evidence during closing argument; it mentioned the tattoos once and only fleetingly in a single sentence.  There was also very strong evidence of guilt—evidence which undoubtedly had a far

---

[11]     Defendant also argues the asserted error in admitting the eyelid tattoo evidence affects his substantial rights, which provides a basis for this court to exercise its discretion to decide the issue on the merits.  For reasons that follow, we do not believe admission of the evidence affected defendant's substantial rights and, in any event, we decline to exercise our discretion to resolve the forfeited issue on the merits.

26

stronger impact on the jury than an expletive eyelid tattoo. The medical evidence showed Abel died from extreme physical injuries, injuries which, as defendant conceded at trial, could not have been inflicted by a 78-year-old woman who could not stand unassisted, which left him and Collins as the only two other possible assailants. On October 17, Collins spent the day on the couch recovering from the effects of both surgery for a caesarian section and an infection; as a result, defendant, who testified he had the strength to inflict the fatal injuries, was Abel's primary caregiver that day, a day on which Abel was being "extra grumpy" according to defendant. Collins testified she heard on that day, as she had in the past, a loud bang coming from the room where defendant was alone with Abel. Defendant admitted to having difficulty managing his anger (at the time, he was on probation for domestic violence) and to being addicted to methamphetamine, which he conceded could trigger violent, aggressive behavior. The results from defendant's drug test taken the day after Abel was hospitalized were also positive for methamphetamine. Collins testified defendant had acted violently toward her during the later stages of her pregnancy, and a neighbor testified he had seen defendant threaten Collins (and her then-unborn child) with a screwdriver pointed at her abdomen while she was pregnant.

### E. *Defendant Forfeited His* Dueñas *Argument*

Relying on *Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant argues the imposition of court operations assessments, conviction assessments, and restitution fines was improper because the trial court did not consider his ability to pay. Defendant was sentenced on November 11, 2020, nearly two years after the

27

Court of Appeal issued its opinion in *Dueñas*. Defendant concedes his trial attorney did not request an ability to pay determination and the record shows his attorney did not object to any of the fees or assessments. The point is accordingly forfeited. (*People v. Flowers* (2022) 81 Cal.App.5th 680, 687; see also *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.

28